PHYLLIS POORE *v.* STATE OF MARYLAND

[No. 649, September Term, 1977.]

*Decided March 8, 1978.*

The cause was argued before GILBERT, C. J., and LISS and COUCH, JJ.

*Henry L. Belsky, Assigned Public Defender,* with whom was *Jana R. Barnett* on the brief, for appellant.

*Stephen B. Caplis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *John Denholm, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

### I.

### THE FEDERAL WIRETAP AND ELECTRONIC EAVESDROPPING LAW AND ITS EFFECT UPON STATE LAW.

Judge Orth (later Chief Judge and now an Associate Judge of the Court of Appeals), in *State v. Siegel,* 13 Md. App. 444, 285 A. 2d 671 (1971), *aff'd* 266 Md. 256, 292 A. 2d 86 (1972), discussed the judicial history which "cleared the way for the enactment of legislation giving sanction to the interception of wire or oral communications," 13 Md. App. at 448-49, 285

A. 2d at 674, the constitutionality of the Omnibus Crime Control and Safe Streets Act of June 19, 1968 (Title III 18 U.S.C. §§ 2510-2520) and the use of the federal act by the prosecutorial authorities in this State. *Siegel* made clear that the several States were permitted to employ the federal wiretap and eavesdropping law only if the principal prosecuting attorney was allowed by State statute to apply for an order authorizing wire or oral communication interception. If the State law empowered the principal prosecuting attorney of a political subdivision to seek such an order, "[t]he State court judge ... [can] grant ... [it] only in conformity with the federal act and 'with the applicable State statute.' " *Id.* at 459, 285 A. 2d at 680.

At the time of *Siegel,* Maryland had two (2) statutes in effect which dealt with the interception of wire or oral communications. Then Md. Ann. Code art. 35, §§ 92-99 (1956 Md. Laws ch. 116) [1] concerned wiretapping and then Md. Ann. Code art. 27, § 125 A-C (1959 Md. Laws ch. 706) [2] and § 125 D (1965 Md. Laws ch. 201) [3] relative to the interception of oral communication.[4]

*Siegel* pointed out that not every violation of the law gives rise to the use of a judicially sanctioned wire or oral communication interception but only those crimes specified in 18 U.S.C. § 2516(2) (1970) which are "murder, kidnapping, gambling, robbery, bribery, extortion, dealing in narcotic drugs, marihuana or other dangerous drugs" and conspiracy to commit any of such crimes. Section 2516(2) was broad enough, however, to include other crimes provided that those crimes are limited to crimes "dangerous to life, limb, or property, and punishable by imprisonment for more than one year" if a State statute so allows. *State v. Siegel,* 13 Md. App. at 462, 285 A. 2d at 682. Moreover, *Siegel* made crystalline

---

1. Md Ann. Code art. 35 was repealed by 1973 Md. Laws, 1st Sp. Sess. ch. 2, § 2 and reenacted in modified form. *See* n. 8 *infra.*

2. Md. Ann. Code art. 27, § 125 A-C was repealed by 1977 Md. Laws ch. 692.

3. *Id.*

4. By the 1977 Md. Laws ch. 692, the Legislature enacted a comprehensive "Wiretapping and Electronic Surveillance Act." The act has been codified in the Courts and Judicial Proceedings Article §§ 10-401 — 10-412 and became effective July 1, 1977.

that the procedural aspects of 18 U.S.C. §§ 2510-2520 (1970), when viewed "in the light of its legislative history, see 2 United States Congressional and Administrative News (1968) 2191-2192, concede no exceptions." *Id.* at 465, 285 A. 2d at 683. Because the State failed to obey the procedural safeguards of the federal act, we affirmed the dismissal by Judge Charles D. Harris in the Criminal Court of Baltimore of the Siegel indictment. The State sought and obtained *certiorari* by the Court of Appeals. That Court affirmed our holding. *State v. Siegel,* 266 Md. 256, 292 A. 2d 86 (1972).

Judge Digges, who authored the opinion for the Court, commented that, "[w]e live in a world which has the capability not only to monitor our conversations, to 'bug' our houses, but soon probably to delve into our innermost thoughts. To allow any of these things to occur without the strictest of controls would utterly destroy the basis of this nation's existence." *Id.* at 260-61, 292 A. 2d at 89. In rejecting the argument that only substantial compliance with the federal act was necessary, Judge Digges responded, "[t]he statute [Title III 18 U.S.C. §§ 2510-2520] sets up a strict procedure that *must* be followed and *we will not abide any deviation, no matter how slight, from the prescribed path." Id.* at 274, 292 A. 2d at 95. (Emphasis supplied.)

This Court, in *Calhoun v. State,* 34 Md. App. 365, 367 A. 2d 40 (1976), utilized the refusal of the Court of Appeals to tolerate a deviation from strict compliance with Title III, 18 U.S.C. §§ 2510-2520, no matter how slight, as "our guiding light." Because the State had not abided by the "prescribed path" of the federal act, we reversed Calhoun's conviction.

## A.

### *The Facts of the Instant Case.*

On January 16, 1976, the State's Attorney of Baltimore City made application to Judge Paul E. Dorf in the Criminal Court of Baltimore for an order "in conformity with the provisions of 18 United States Code, Sections 2510-2530 [*sic*], for the issuance of a Wiretap Order." A reading of the application, however, indicates that the application really sought the

court's permission to enter secretly a hospital room in the University Hospital and to plant a particularly described transmitter or "bug" within that room. William A. Cooper, a suspected dealer in heroin, was a patient in the room where the listening device was to be secreted. The application was based on the joint affidavit of Detectives Caggese and Smoot of the Baltimore City Police Department. That the affidavit established probable cause for the issuance of the order is not challenged so that we shall not set out the nefarious acts allegedly committed by William A. Cooper and eight (8) other named companions of Cooper in the illicit drug dispensing business. Judge Dorf signed the order on the same day. It provided that the eavesdropping would be between the hours of "10:00 A.M. and 2:00 A.M.," January 17, 1976, until 2:00 A.M. on February 1, 1976. 18 U.S.C. § 2518(4)(e) (1970). The order also provided for orally advising the court of the "progress of the interception." The progress reports were to be made to the judge each Monday and Thursday during the life of the order. 18 U.S.C. § 2518(6) (1970). Upon the termination of the order, "the State's Attorney ... or a prosecutor designated by him, and Detectives Caggese and Smoot ... shall immediately make a Return to this Court of any and all logs and tape recordings obtained pursuant to this Order. ..." 18 U.S.C. § 2518(8)(a) (1970).

Additionally, the order commanded "that no later than ninety days after the termination of the interception process authorized by this Order, or extension hereof, an inventory shall be served upon the aforementioned persons and such other parties as this Court may designate in the interest of justice." 18 U.S.C. § 2518(8)(d) (1970).

The "bug" was installed in a fluorescent fixture directly above the bed of William A. Cooper.[5] All conversation occurring within the room was transmitted to and recorded by the surveillance team located on the floor above the one on which Cooper was a patient. The eavesdropping was "closed down at 4 o'clock on the 31st [of January]." The tape

5. Cooper was never charged in this case. Apparently, because of his hospitalization, occasioned by an automobile accident leaving Cooper a paraplegic, the State elected not to proceed against him.

recordings were turned over to Assistant State's Attorney F. Pond on February 1, 1976. Pond presented them to Judge Dorf on February 4, 1976. Judge Dorf apparently ordered them sealed and placed in the custody of the Clerk of the Criminal Court for safekeeping. None of the parties whose conversation was recorded by the police was notified within the prescribed period. Notice was given to them on various dates from May 24, 1976, through June 7, 1976.

A second electronic intercept order was obtained on application by the State's Attorney, supported by the affidavit of Detectives Caggese and Smoot on February 17, 1976. The order permitted wiretaps to be placed upon the telephones of Anna Mae Jones at 3409 Milford Avenue, Jacqueline Gilliam, second floor of the same address, and Gerard Jones, third floor of the same address. The persons whose conversations were to be intercepted were the same as those named in the eavesdrop order of January 16, 1976.

Subsequently, arrests were made and the appellant, Phyllis Poore, along with Elizabeth Jennings (alias Elizabeth Harrington), Juliette Jennings, Gary Gilliam, Albert Tubman, Anna Mae Jones, Jackie Gilliam, Janie Harrington Brown, and James Garfield Gregory,[6] was indicted by the Grand Jury of Baltimore City for violating the Controlled Dangerous Substances laws of this State; all were convicted in the Criminal Court of Baltimore for one or more violations of those laws; all were apprehended as a result of judicially authorized eavesdropping or wiretapping; all have appealed; all assert the illegality of the State's intrusion into their illicit business; all bottom their attack on the judgments of the Criminal Court on violations of Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

Although this appeal is concerned with Phyllis Poore, oral argument on the issues of the validity of the eavesdrop and wiretap raised by all appellants was consolidated.[7] *Ergo,* what

6. Poore, Elizabeth Jennings, Juliette Jennings, Tubman, and Gregory were not named in either of the electronic intercept orders.

7. Elizabeth Jennings, alias Elizabeth Harrington, and Juliette Jennings are involved in appeal number 658. Gary Gilliam and Albert Tubman are before us on appeal number 732. Anna Mae Jones is here on appeal number 737. Jackie Gilliam and Janie Harrington Brown have also appealed. The

we hold in this opinion with respect to those issues applies to each of the consolidated cases. Rather than repeat the discussion in each case, we shall merely refer to Part II of this opinion.

The appellants moved to suppress the evidence obtained through the eavesdrop order, to suppress the evidence acquired as a result of the wiretap because it was tainted by the illegality of the eavesdrop and to suppress the search and seizures for the same reason.

At the suppression hearing on the eavesdrop evidence, Assistant State's Attorney Denholm testified that he had petitioned Judge Dorf to extend the time in which the State was to notify those persons whose conversations had been electronically intercepted through the transmitter in the hospital room. Mr. Denholm told the hearing judge that Judge Dorf had signed such an order extending the time for notification to June 9, 1976, but that neither Judge Dorf nor Mr. Denholm was able to locate a copy of it. Denholm further stated that it was not placed under seal and turned over to the clerk of the court but that he, Denholm, kept it in his file. A paper writing purporting to be a copy of the petition to extend the time for notification was offered by the State. The petition was rejected by the hearing judge as the result of an objection, but the testimony of Mr. Denholm remained despite appellants' efforts to have it stricken.

Other issues raised by the appellants were the failure of the State to comply with the order directing the surrender of the tapes to Judge Dorf immediately upon the termination of the eavesdrop and failure to minimize so as to avoid the overhearing of privileged communication. Appellants contend that a lapse of four (4) days between the cessation of the eavesdrop surveillance and the surrender of the tapes to Judge Dorf cannot be equated to "immediate," and that the

---

number of their appeal is 1127. James Garfield Gregory is before us on appeal number 744.

Dwight McNair, who pleaded guilty and was subsequently denied the right to withdraw that plea, was also consolidated inasmuch as if he had prevailed on the withdrawal issue, the questions raised in the consolidated argument would have applied to him. We affirmed the McNair judgment in an unreported per curiam opinion, McNair v. State, No. 695, September Term, 1977, filed February 21, 1978.

listening to and, in some instances with respect to the wiretaps, recording of privileged communications between counsel and client vitiates the wiretap order.

The hearing judge suppressed "out of an abundance of caution" the conversations between attorney and client but denied the other motions. The reasons assigned were that "the failure to provide notice [of the eavesdrop] was an inadvertence" and that "the notification requirements were substantially complied with and there has been no showing of prejudice. . . ."

The matter of the delay in turning the eavesdrop tapes over to Judge Dorf was not ruled upon in the criminal court and has not been pressed here. In any event, its delay is *de minimis*. *United States v. Sklaroff*, 506 F. 2d 837 (5th Cir. 1975), *cert. denied,* 423 U. S. 874, 96 S. Ct. 142, 46 L.Ed.2d 105 (1975).

## II.

## POST-ORDER COMPLIANCE WITH FEDERAL ELECTRONIC INTERCEPTION ACT.

### *A. Application for Notification Extension Order.*

Title III, 18 U.S.C. § 2518(8)(d) (1970) provides:

"Within a reasonable time but not later than ninety days after the filing of an application for an order of approval under section 2518(7) (b) which is denied or the termination of the period of an order or extensions thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory which shall include notice of —

(1) the fact of the entry of the order or the application;

(2) the date of the entry and the period of authorized, approved or disapproved interception, or the denial of the application; and

(3) the fact that during the period wire or oral communications were or were not intercepted. The judge, upon the filing of a motion, may in his discretion make available to such person or his counsel for inspection such portions of the intercepted communications, applications and orders as the judge determines to be in the interest of justice. On an ex parte showing of good cause to a judge of competent jurisdiction the serving of the inventory required by this subsection may be postponed." [8]

Although there was testimony by Mr. Denholm that he petitioned for and obtained an extension of the time in which to notify those parties whose oral communication had been intercepted by the police, no order authorizing the delay in notification was ever found.[9] That mishap presents several interesting questions, *videlicet*—Is post-order compliance with 18 U.S.C. §§ 2510-2520 on the same footing as pre-order compliance? Is the failure to seal an order extending notification fatal to the validity of the original intercept order? Does section 2518(8)(d) require the *principal* attorney to seek an extension of notification order, just as section 2516(2) mandates his making application for the original intercept order or may he delegate that task?

Although *Siegel* declares that the Court of Appeals will not abide the slightest deviation from the prescribed path with respect to electronic surveillance, *Spease and Ross v. State,* 275 Md. 88, 338 A. 2d 284 (1975), distinguishes between pre-order compliance and post-order compliance. In *Spease,* Chief Judge Murphy noted that *Siegel* turned on the failure of the order authorizing the wiretap "to meet the precondition requirements . . . [unlike *Spease*] in that . . . it did not specify that the surveillance was to be conducted over a certain time period; that there was to be automatic termination upon the

8. Md. Cts. & Jud. Proc. Code Ann. § 10-408 (g) (4), effective July 1, 1978, does not contain a provision for an extension of time in which to give notice of the inventory.

9. What the Assistant State's Attorney did in this case was unwittingly to prove the truth of Roos's Law: "If there is a harder way of doing something, some one will find it." Ralph E. Roos.

interception of certain conversations;" *Id.* at 108, 338 A. 2d at 295, nor was there a minimization of listening to non-pertinent conversations or instruction to terminate upon attainment of the objective. The *Spease* case clearly involved post-order notification. Spease did not receive the notice prescribed by section 2518(8)(d) because in the view of the issuing judge, Spease was not the target of the order nor was he named in the order. Spease, did, however, receive informal notice of the wiretap three (3) weeks before trial. His rights under section 2518(9), which prohibits use of evidence of intercepted communications unless at least ten (10) days prior to trial the party against whom it is to be offered is furnished with a copy of the application and the electronic interception order, were not breached. With respect to Ross, the target of the interception and Spease's codefendant, there was no formal compliance with section 2518(8)(d), but Ross did receive a copy of the search and seizure warrant and affidavit in support thereof. The affidavit for the search and seizure warrant contained "all the details concerning the interception." *Id.* at 103, 338 A. 2d at 293. The Court held with regard to Ross that the notification he received "constituted compliance with the inventory requirement of the statute." *Id.* at 106, 338 A. 2d at 294. Spease, the Court said, received "actual notice of the wiretap ... almost six months prior to trial, ... [and] did not suffer any prejudice," *Id.* at 109, 338 A. 2d at 296, resulting from the failure of the State to follow precisely the inventory notification.

At first glance *Spease* appears to conflict with *Siegel.* A careful reading of both cases makes it transpicuous that *Siegel* is directed to pre-intercept and intercept conditions. As to those two (2) happenings, not the slightest deviation from the statute will be sanctioned. On the other hand, *Spease* indicates that when post-intercept events are brought into question, the Court looks to the facts so as to ascertain whether there has been substantial compliance with the post-intercept provisions of the act and whether there has been actual prejudice to the defendant. Thus, it is obvious that there is a distinction between *pre-order* and *post-order* compliance. In the former, a defect will void the order and

cause suppression of the evidence, but in the latter, a defect will not vitiate the order if there has been substantial compliance and no prejudice to the defendant is shown.

The failure to seal an order extending the time in which notification of the inventory required by section 2518(8)(d) is a post-order condition. The act itself is silent as to both the form of the order, *Spease & Ross v. State, supra,* and as to whether the order is to be sealed. We think that the spirit of the act necessitates that such extension orders be under seal and kept in the same place as the original intercept order. We so think because inasmuch as the purpose of the act is confidentiality, it is illogical to require the original order to be under seal of the court, and hence not public information until its existence is revealed at trial, if an order allowing an extension of time for notification of the inventory is not sealed and thus part of the public records. While the extension of notification order does not disclose the contents of the interception, it does, unless sealed, make the existence of an interception public.

We believe the intent of the Congress to have been that all *ex parte* orders extending the time in which the inventory notice is to be served upon the persons named in the interception order "and such other parties . . . as the judge may determine . . . in the interest of justice," 18 U.S.C. § 2518(8)(d) (1970), must be under seal of the court and treated in the same manner as the order authorizing interception.

The question still remains as to whether the failure to seal the order extending the time in which the notification mandated by section 2518(8)(d) is fatal. In the instant case, the order that extended the time in which to notify the parties whose conversations had been intercepted was kept by the Assistant State's Attorney "in his files." There is nothing to indicate that the order was docketed. The State, conceding "that the procedures followed . . . in this case were not only inappropriate but rather careless," argues that because the order was retained by the assistant prosecutor, "it is apparent that . . . [it] was not docketed or otherwise published. Therefore, . . . confidentiality was maintained in regard to

notification and substantial compliance was accomplished." We are unable to share the State's conclusion that the petition for and the order allowing the extension of time for notification did not become public. There is no evidence as to what person or persons had access to the Assistant State's Attorney's files, and, indeed, in view of his inability to locate the order, it is reasonably safe to infer that the order was not placed in the file, or if placed there, was removed by some unauthorized person. Either happening makes confidentiality suspect.

Nevertheless, the failure to have the extension order sealed, in view of its not being docketed, would not appear to be such a substantial departure from the post-order procedures of Title III, 18 U.S.C. § 2518 as to require suppression.

### B. Role of Principal Attorney.

Title III, 18 U.S.C. § 2516 provides in pertinent part:

"(1) *The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize on application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications* by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of —

(a) any offense punishable by death or by imprisonment for more than one year under sections 2274 through 2277 of title 42 of the United States Code (relating to the enforcement of the Atomic Energy Act of 1954), or under the following chapters of this title: chapter 37 (relating to espionage), chapter 105 (relating to

sabotage), chapter 115 (relating to treason), or chapter 102 (relating to riots);

(b) a violation of section 186 or section 501(c) of title 29, United States Code (dealing with restrictions on payments and loans to labor organizations), or any offense which involves murder, kidnapping, robbery, or extortion, and which is punishable under this title;

. . .

"(2) *The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications,* may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses." (Emphasis supplied.)

The Supreme Court, in *United States v. Giordano,* 416 U. S. 505, 94 S. Ct. 1820, 40 L.Ed.2d 341 (1974), construed section 2516(1) as meaning that only the "Attorney General or any Assistant Attorney specifically designated by the Attorney General," 18 U.S.C. § 2516(1) (1970), was authorized to apply

to a federal judge for an electronic interception order. An approval of the application by the "Executive Assistant to the Attorney General," *Id.* at 510, 94 S. Ct. at 1824, 40 L.Ed.2d at 350, based on his "knowledge of the Attorney General's actions in previous cases," *Id.,* did not satisfy the statute. A wiretap order by the United States District Court for the District of Maryland was invalid and the evidence derived therefrom was suppressed.

Section 2516(2) speaks of "[t]he principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision. . . ." The language of that section does not confer upon the principal prosecuting attorney any power to delegate to an assistant the authority to apply for an electronic interception. The Congress would not have so carefully limited the power of the Attorney General of the United States to delegate to a specifically designated assistant the authority to seek orders to intercept oral or telephonic communications and at the same time bestowed upon the principal prosecutor of any State, city or county in the nation an unbridled license to clothe any or all of his or her assistants with permission to seek such orders. It is inconceivable that the country's highest legal officer would be so shackled while the principal prosecutor of the least populated county in the United States was free to permit any designee to apply for an interception order. We think the intent of the Congress to be that the authority devolved upon the principal prosecutor of the State or of the political subdivision, is personal to him, and may not be delegated. "[T]he authority to apply for court orders is to be narrowly confined . . . to those responsive to the political process, a category to which the . . . [Assistant State's Attorney] does not belong." [10] *United States v. Giordano,* 416 U. S. at 520, 94 S. Ct. at 1829, 40 L.Ed.2d at 356.

We are supported in our holding by an examination of former Md. Cts. & Jud. Proc. Code Ann. § 10-403 (1974) and former Md. Ann. Code art. 27, § 125A-D, which were in effect

---

10. The Attorney General of Maryland, the City of Baltimore State's Attorney, and all county State's Attorneys are answerable directly to the electorate. An assistant to any of them is not so answerable.

at all times during the surveillance, indictment, and trial of this case, as well as the current Md. Cts. & Jud. Proc. Code Ann. § 10-406 (Supp. 1977). All speak of "The Attorney General or any State's Attorney" as being the person to apply for "an order authorizing the interception of wire or oral communications. . . ." *Id.* Nowhere in any of the former statutes or the present statute is there so much as a hint that the Attorney General or the State's Attorney may delegate the authority to apply for interception orders. The statutes, both past and present, empower only the Attorney General or the State's Attorney to seek such orders. It is a power entrusted solely to them as they are the ones answerable through the political process to the electorate.

Title III, 18 U.S.C. § 2518(8)(d) (1970) does not indicate whether the *ex parte* showing of good cause for a postponement of the inventory must be made by the principal prosecutor. In fact, the last sentence of 18 U.S.C. § 2518(8)(d) (1970) that "[o]n an ex parte showing of good cause to a judge of competent jurisdiction the serving of the inventory required by this subsection may be postponed" read literally suggests that the *ex parte* showing need not be made to the judge that issued or denied the interception order. The other language of 18 U.S.C. § 2518(8)(d) (1970) concerns the judge who issued or denied the order. If the statute means what it seems to say, it is theoretically possible for the issuing or denying judge to cause the inventory to be served while another "judge of competent jurisdiction" is simultaneously postponing the notice. Needless to say, such a situation would wreak havoc with any ongoing investigation. We think the statute has to be read as meaning the *ex parte* showing for a postponement of notice must be made to the issuing or denying judge unless that judge is no longer on the bench or because of physical or mental disability is unavailable.

Furthermore, we believe that the *ex parte* showing for good cause for a postponement of notice is to be made by the *principal* prosecuting attorney and not his representative. We so believe because the provisions of the statute sanctioning the interception order provides that the order may be passed or denied by the judge on application of the principal

prosecutor, and we cannot find within it any indication, expressed or implied, empowering the delegation of that authority by the principal prosecutor. In our view, the Congress did not intend for the principal prosecutor to shift responsibility to an assistant once the order was issued or denied.

### C. Effect of Failure to Notify Within Statutorily Stated Time.

During the course of an oral opinion delivered at the close of the suppression hearing in the matter now before us, the judge, after observing the fulfillment of the notice provisions of the act with respect to the wiretap, said:

"There's no such notification of the eavesdrop. Defendant's counsel cites *Washburn v. State*, 19 Md. App. 187, at page 199, where it was asserted that notice requirements are mandatory and recognized that notice may be postponed on a showing of good cause. It is further contended that ... [section] 2518(8)(b) requires that all applications and orders granted under this chapter must be sealed by the judge. The State admits that this was not done. If this section can be construed as a precondition for the validity of the order authorizing the eavesdrop, then communications obtained thereby should be suppressed."

The judge did not so construe section 2518(8)(b). She denied the suppression motion grounded on the fact that the defendants received notice and inventory even though the receipt was without the ninety (90) days prescribed by section 2518(8)(d). The judge also observed that there was no showing by the defendants that they were prejudiced by the delay in notification and inventory of the eavesdrop.

The appellants read section 2518(8)(d) as mandating that if the notice and inventory is not furnished by the State to defendants within the ninety (90) day period or any extension thereof, the eavesdrop is flawed and the evidence, directly or

indirectly obtained therefrom, should be suppressed. We disagree.

The Supreme Court, in *United States v. Donovan,* 429 U. S. 413, 97 S. Ct. 658, 50 L.Ed.2d 652 (1977) in reversing *Donovan v. United States,* 513 F. 2d 337 (6th Cir. 1975), said:

> "The legislative history [of the Omnibus Crime and Safe Streets Act of 1968] indicates that postintercept notice was designed instead to assure the community that the wiretap technique is reasonably employed. But even recognizing that Congress placed considerable emphasis on that aspect of the overall statutory scheme, *we do not think that postintercept notice was intended to serve as an independent restraint on resort to the wiretap procedure."* [11] (Emphasis supplied.) 429 U. S. at 439, 97 S. Ct. at 674, 50 L.Ed.2d at 675.

Similar views are expressed by some Federal Circuit Courts of Appeal before the Supreme Court decided *Donovan. See e.g., United States v. Bohn,* 508 F. 2d 1145, 1148 (8th Cir. 1975), *cert. denied,* 421 U. S. 947, 95 S. Ct. 1676, 44 L.Ed.2d 100 (1975); *United States v. Rizzo,* 492 F. 2d 443, 447 (2d Cir. 1974), *cert. denied,* 417 U. S. 944, 94 S. Ct. 3069, 41 L.Ed.2d 665 (1974); *United States v. Iannelli,* 477 F. 2d 999, 1003 (3d Cir. 1973), *aff'd on other grounds,* 420 U. S. 770, 95 S. Ct. 1284, 43 L.Ed.2d 616 (1975); *United States v. Wolk,* 466 F. 2d 1143 (8th Cir. 1972). The Court of Appeals, Second Circuit, in *United States v. Principie,* 531 F. 2d 1132, 1141-42 (2d Cir. 1976), held that absent a showing of prejudice, a failure to notify within ninety (90) days those persons whose conversations had been intercepted was not sufficient to require suppression of the evidence. The court, in *Principie,* rejected the rationale of the Sixth Circuit's *United States v. Donovan,* 513 F. 2d 337 (6th Cir. 1975) and the Fourth Circuit's *United States v. Bernstein,* 509 F. 2d 996 (4th Cir. 1975),

---

11. Mr. Justice Marshall dissented, being of the view that, "[t]he Court's conclusion that the notice provision is not central, dismantles this carefully designed congressional structure." 429 U. S. at 450, 97 S. Ct. at 679, 50 L.Ed.2d at 681. Mr. Justice Brennan joined in the dissent, and Mr. Justice Stevens joined in two (2) parts of the dissent including this particular language.

noting that *Donovan* was then pending before the Supreme Court and that *certiorari* had been prayed in *Bernstein,* which, following quickly on the heels of *Donovan,* was vacated, and remanded. 429 U. S. 998, 97 S. Ct. 1167, 51 L.Ed.2d 578 (1977).

This Court, in *Spease, supra,* speaking through Judge Moylan, anticipated the Supreme Court's *Donovan* decision by approximately three (3) years. We declined to equate post-order compliance with pre-order compliance, and pointed out that the failure to file a proper or timely inventory should not result in a suppression of the evidence unless prejudice was demonstrated. 21 Md. App. 269, 293-99, 319 A. 2d 560, 573-76 (1974). Chief Judge Murphy, writing for the majority in *Spease & Ross v. State,* 275 Md. at 103-09, 338 A. 2d at 293-96, reached the same conclusion and for substantially the same reasons.

The net result is that even though the order permitting the extension of the time in which to give notice and file an inventory was not under seal, cannot be found, and the Assistant State's Attorney rather than the principal prosecutor sought and obtained the extension (those largely ministerial functions, all occurring after the termination of a valid, judicially authorized eavesdrop) are not individually or collectively sufficient to invoke the sanctioned suppression unless there is a showing by the defendants of prejudice.

On the strength of *United States v. Donovan, supra,* as well as *Spease & Ross v. State, supra,* and their ancestors, we hold that the hearing judge did not err in refusing to suppress the evidence because of a failure to adhere strictly to section 2518(8)(d). The sanctions mandated by the act and by *Siegel* do not apply to the notice and inventory features of 18 U.S.C. §§ 2510-2520 (1970).

We are not to be understood as approving the carelessness of the State in the instant case. Indeed, we condemn the haphazard way in which the State so loosely followed the post-order provision of section 2518(8)(d). Only the failure of the appellant to demonstrate prejudice stands between the admission of the evidence and its suppression.

## III.

## PROBABLE CAUSE FOR THE WIRETAP.

Appellant Poore next argues that the wiretap order issued on February 17, 1976, was not based upon probable cause. The thrust of that assertion is that the tapes made pursuant to the eavesdrop order were lacking in fidelity and "so abominable that no finding of probable cause could have been based thereon."

It was stipulated among the court and all counsel that the eavesdrop tapes were not discernible to them. Detective Caggese, however, testified that he could, with "difficulty but not great difficulty" discern the taped conversations. The "conversations" revealed to Caggese that William Cooper was "losing control of the organization. . . ." Hearing that, Detectives Caggese and Smoot sought out two (2) informants, identified only as "N.U.I. # 432" and "N.U.I. # 456." The reliability, credibility and basis of knowledge of the informants is not here under attack, but even if it were, the affidavit in support of the wiretap disclosed that the *Aguilar v. Texas,* 378 U. S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723 (1964) requirements were satisfied. Reliability and basis of knowledge were indubitably demonstrated. Informant # 432 told Caggese and Smoot on January 23, 1976, that "he was informed that day . . . that the COOPER Family's business (heroin traffic) has been split up and that any problems or any needs would have to go through . . . [Ronnie Purcell] or BOOTSIE (Anna Mae Jones). . . . This information was known to N.U.I. # 432 because RONNIE explained the whole new set up to N.U.I. # 432." Informant # 432 was also furnished with two (2) telephone numbers in order for him to contact BOOTSIE. The numbers were the same as those for which the tap was sought.

Caggese and Smoot, eleven (11) days later, contacted N.U.I. # 456 who "stated that he had been purchasing heroin from the COOPER family for the past year" [12] and has had his

---

12. Such a statement made against penal interest establishes credibility. United States v. Harris, 403 U. S. 573, 91 S. Ct. 2075, 29 L.Ed.2d 723 (1971); Cuffia v. State, 14 Md. App. 521, 287 A. 2d 319 (1972).

dealings in the residence where the telephones to be tapped were located. Informant # 456 advised the detectives that "as a result of *recent* conversations [13] he has had with BOOTSIE, that heroin is delivered to 3409 Milford Avenue when it is first brought into Baltimore." (Emphasis supplied.) The informant also said "that he has on several occasions overheard BOOTSIE make several phone calls out of state and discuss heroin deals." We think the information gleaned from the informant established independent probable cause for the issuance of the wiretap order, irrespective of the clarity of the eavesdrop tapes. The hearing judge did not err in refusing to suppress evidence obtained from or as a result of the properly issued wiretap.

## IV.

### RECORD AND SPOT-CHECKING OF CONVERSATIONS.

Appellant claims that "[c]ontrary to the mandate [of the eavesdrop and wiretap orders], the method of recordation . . . invited editing or other alterations." She finds the method used by the monitors as "defective for two (2) reasons: (1) by permitting undetectable listening, it invites impermissible intrusions into privacy; and (2) it does not provide any assurance that the recordings are free from editing or other alteration." After painstakingly suggesting the cure for the alleged flaws, appellant asserts that "[b]ecause of these two (2) defects, it cannot be said that the recording was protected from editing or other alteration." Appellant engages in sheer speculation as there was not a gossamer of evidence that the records were edited or altered. The testimony was that efforts were made not to overhear private conversations not relative to the trafficking in drugs, but "spot checking" on those conversations was employed. Common sense dictates that a "private conversation" on an unrelated subject may be changed by the parties thereto into a discussion relating to the very matter for which the interception order has been obtained. The only way for the monitor to know whether the

13. *See* State v. Kraft, 269 Md. 583, 307 A. 2d 683 (1973), *reversing* 16 Md. App. 347, 297 A. 2d 328 (1972).

conversation has moved from the non-pertinent to the pertinent is by "spot checking." Should "spot checking" be impermissible, the way to defeat absolutely an electronic surveillance would be to commence any and all conversations with non-pertinent subject matter and after a reasonable period switch to the pertinent. No recording concerning any nefarious activity would ever be made if it were preceded by non-pertinent topics.

We perceive no error in the method used by the police in monitoring the conversations in the case now before us.

## V.

## MINIMIZATION.

Appellant, Phyllis Poore, and those appellants who have been joined in the order of consolidation [14] assail the interception of telephone calls between Jackie Gilliam [15] and Henry L. Belsky, Esquire, and between Anna Mae Jones and Belsky. The monitors had been instructed not to listen to or record conversations between attorney and client. Failure to obey that instruction, appellant reasons, mandates the suppression of all the evidence, notwithstanding the hearing judge's having suppressed the conversations between attorney and client.

The Fourth Amendment to the United States Constitution, and Title III 18 U.S.C. § 2518(5) (1970),[16] in order to prevent unnecessary intrusion into the privacy of the surveillance target, require "that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception. . . ." 18 U.S.C. § 2518(5) (1970). "Each aggrieved person is entitled to question whether the statutory minimization requirement has been satisfied and, on proving that it has not, to move to

---

14. *See* n. 7, *supra.*
15. *Id.*
16. Section 2518(5) was passed by Congress in order to comply with the constitutional mandate of Berger v. New York, 388 U. S. 41, 87 S. Ct. 1873, 18 L.Ed.2d 1040 (1967), that wiretapping must be conducted with "particularity." *See* United States v. Vento, 533 F. 2d 838, 850 (3d Cir. 1976). "Particularization" is necessary in view of the all-embracing invasion of privacy potential in wiretapping.

suppress a communication on the ground that 'the interception was not made in conformity with the order of authorization or approval.' 18 U.S.C. § 2518(10)(a)(iii)." *United States v. Scott*, 504 F. 2d 194, 197 (D.C. Ct. of App. 1974).

Section 2518(5) is legislative direction that surveillance should be limited as much as possible. *United States v. Turner*, 528 F. 2d 143, 156 (9th Cir. 1975), *cert. denied*, 423 U. S. 996, 96 S. Ct. 426, 46 L.Ed.2d 371 (1975); *United States v. Armocida*, 515 F. 2d 29, 42 (3d Cir. 1975), *cert. denied*, 423 U. S. 858, 96 S. Ct. 111, 46 L.Ed.2d 84 (1975); *Spease & Ross v. State, supra*. *Spease* declares that "[t]he standard for compliance with the requirement to minimize is the overall reasonableness of the totality of the conduct of the monitoring agents in light of the purpose of the wiretap and the information available to the agents at the time of interception." 275 Md. at 99, 338 A. 2d at 290. *See United States v. Armocida*, 515 F. 2d at 42. Chief Judge Murphy said in *Spease* that the minimization requirement of section 2518(5) "is nothing more than a congressional command to limit surveillance as much as possible in the circumstances. . . ." 275 Md. at 99, 338 A. 2d at 291. Whether' there has been a compliance with the "congressional command" is a question that must be answered on a case-by-case basis. *See United States v. Losing*, 539 F. 2d 1174, 1181 (8th Cir. 1976); *United States v. Armocida*, 515 F. 2d at 42. "The reasonableness of the conduct of the monitoring agents at the time of the interception and their good faith are determining considerations." *Spease & Ross v. State*, 275 Md. at 99, 338 A. 2d at 291. *See United States v. Armocida*, 515 F. 2d at 42; *United States v. James*, 494 F. 2d 1007, 1018 (U.S. App. D.C. 1974), *cert. denied*, 419 U. S. 1020, 95 S. Ct. 495, 42 L.Ed.2d 294 (1974); *United States v. Manfredi*, 488 F. 2d 588 (2d Cir. 1973), *cert. denied*, 417 U. S. 936, 94 S. Ct. 2651, 41 L.Ed.2d 240 (1974); *United States v. Tortorello*, 480 F. 2d 764, 784 (2d Cir. 1973), *cert. denied*, 414 U. S. 886, 94 S. Ct. 63, 38 L.Ed.2d 86 (1973). Thus, in certain factual settings the interception of *all* conversations may be justified, *United States v. Bynum*, 485 F. 2d 490 (2d Cir. 1973), yet be violative

of the minimization provision, given other factual surroundings. *Spease & Ross v. State,* 275 Md. at 100, 338 A. 2d at 291. *See United States v. Losing,* 539 F. 2d at 1180; *United States v. Turner, supra; United States v. King,* 335 F. Supp. 523 (S.D. Cal. 1971), *rev'd on other grounds,* 478 F. 2d 494 (9th Cir. 1973).

Synthesizing the decisions of the courts pertaining to minimization, Chief Judge Murphy, in *Spease & Ross v. State, supra,* stated that "there are a number of factors," 275 Md. at 100, 338 A. 2d at 291, which are of assistance to the court when confronted with a question of whether a particular interception is reasonable under the attendant circumstances. The factors include:

> "(1) the nature and scope of the crime being investigated; (2) the sophistication of those under suspicion and their efforts to avoid surveillance through such devices as coded conversations; (3) the location and operation of the subject telephone; (4) government expectation of the contents of the call; (5) the extent of judicial supervision; (6) the duration of the wiretap; (7) the purpose of the wiretap; (8) the length of the calls monitored; (9) the existence of a pattern of pertinent calls, which the monitoring agents could discern so as to eliminate the interception of non-pertinent calls; (10) the absence of monitoring of privileged conversations." 275 Md. at 100, 338 A. 2d at 291.

The ten (10) factors articulated in *Spease* were not intended to be all inclusive or exhaustive.

Appellants claim that they were the victims of an overtap. Conversations were either subject to continuous monitoring or "spot checked." Certain conversations subject to the attorney-client privilege were recorded. Those privileged conversations were suppressed, however, by the trial court. Notwithstanding the suppression, appellants contend that the interception of the privileged conversations in and of itself requires total suppression of the evidence. Close examination of the procedure employed by the State discloses that the

State's methods appear appropriately designed to limit impermissible interceptions "to a practical minimum while allowing the legitimate aims of the . . . [State] to be pursued." *United States v. Turner,* 528 F. 2d at 156.

The first consideration is "the nature and scope of the crime being investigated." *Spease & Ross v. State,* 275 Md. at 100, 338 A. 2d at 291, which in this case was a "[l]arge and sophisticated narcotics conspirac[y] . . . justify[ing] considerably more interception than would a single criminal episode." *United States v. Quintana,* 508 F. 2d 867, 874 (7th Cir. 1975). *See also United States v. Daly,* 535 F. 2d 434, 441 (8th Cir. 1976); *United States v. Cox,* 462 F. 2d 1293, 1300-01 (8th Cir. 1972), *cert. denied,* 417 U. S. 918, 94 S. Ct. 2623, 41 L.Ed.2d 223 (1974). The courts generally permit a greater latitude to officials conducting a sweeping investigation and have held a wider range of intercepted calls to be pertinent. Low, *Post-Authorization Problems in the Use of Wiretaps: Minimization, Amendment, Sealing, and Inventories,* 61 *Corn. L. Rev.* 92, 110 (1975). Interwoven with the examination of the nature and scope of the crime under investigation is "the purpose of the tap." *Spease & Ross v. State,* 275 Md. at 100, 338 A. 2d at 291. According to Detective Caggese, the aim of the wiretap was to identify the principals in the interstate operation. Extensive wiretapping is more justified when, as here, its aim is to discover the identities of far-flung conspirators and to determine the scope of the operation. *United States v. Losing,* 539 F. 2d at 1180.

The third problem confronting the investigators in the case *sub judice* was the sophisticated nature of the conspiracy and the tendency of the conspirators to communicate in the special jargon of the drug world. When conspirators converse in a colloquial code, thereby creating superficially innocuous conversations that are, in reality, relevant to the investigation, the courts have been more permissive when reviewing claims of over-reach or failure to minimize. *United States v. Losing, supra; United States v. Armocida, supra;* Low, *Post-Authorization Problems in the Use of Wiretaps: Minimization, Amendment, Sealing, and Inventories,* 61 *Corn. L. Rev.* 92, 110 (1975). Although references in the matter now

before us to "candy" and "dresses" may sound innocent to the lay ear, trained narcotics agents verified that those words, in actuality, were an allusion to drugs, particularly heroin. Since coded conversations were the norm in this case, the monitors had no way of pre-identifying guilt-free conversations by subject matter. Under the circumstances "spot checking" and comprehensive monitoring of conversations are sanctioned. *United States v. Losing, supra. See United States v. Turner, supra.*

> "It is often impossible to determine that a particular telephone conversation would be irrelevant and harmless until it has been terminated. It is certainly not unusual for two individuals using the telephone to discuss social matters or items of general interest before getting to the precise point which is to be covered in the call." *United States v. LaGorga,* 336 F. Supp. 190, 196 (W.D. Pa. 1971).

> "Accordingly, where, as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls made during several days does not constitute a failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value." *United States v. Cox,* 462 F. 2d at 1300-01.

Where coded conversations are utilized to obfuscate the true meaning of the dialogue, perfection in minimization is virtually impossible. Portions of irrelevant conversation must invariably be heard before a monitor determines that a conversation is without the scope of his warrant. The Fourth Amendment was designed to prevent *unreasonable* searches and seizures, "and it seems *reasonable* to expect that some innocent conversations will be picked up." Low, *Post-Authorization Problems in the Use of Wiretaps: Minimization, Amendment, Sealing, and Inventories,* 61 *Corn. L. Rev.* 92, 97 (1975). (Emphasis supplied.) Even after the officer determines that the colloquy is facially irreproachable, "spot checking" may still be advisable. A single word or phrase artfully inserted in the course of an apparently

harmless *tete-à-tete* may convert that seemingly innocent conversation into a flagrant criminal conspiracy. "Sampling [spot-checking] is necessary to thwart wary criminals who slip a few incriminating statements into a long, chatty, personal call." Low, *Post-Authorization Problems in the Use of Wiretaps: Minimization, Amendment, Sealing, and Inventories,* 61 *Corn. L. Rev.* 92, 121 n. 140 (1975).

A fourth impediment to greater minimization in the instant case was "the location and operation of the subject telephone." *Spease & Ross v. State,* 275 Md. at 100, 338 A. 2d at 291. As the Attorney General points out, "the telephones were located in a private residence, [and] the monitors had no way of inspecting the contents of incoming or outgoing calls, because so many of the local and New York people were at first unknown." The police initially had no definite idea of the exact dimensions of the drug ring and were compelled to intercept all calls to and from the appellants' home phones in order to ascertain the perimeters of the conspiracy. The presence of three (3) telephones in the home led the police to conclude that if the home was a center for drug trafficking, the volume of drug related calls should be heavy. As the Court noted in *Spease,* the fact that the home phone was "central to the drug operation," 275 Md. at 102, 338 A. 2d at 292, was a significant factor in considering whether proper safeguards toward minimization had been used. *See generally United States v. James, supra.*

A fifth factor that the Court must weigh is the State's "expectation of the contents of the call," *Spease & Ross v. State,* 275 Md. at 100, 338 A. 2d at 291. The agents had no reason to believe that any particular call would be innocent, despite the fact that the target phones were located in a private home. "Some of the appellants were family members or close friends. Thus, their conversation often contained innocent social matter as well as pertinent [criminal] information." *United States v. Quintana,* 508 F. 2d at 875. *Accord, United States v. Kirk,* 534 F. 2d 1262, 1275 (8th Cir. 1976); *United States v. Turner,* 528 F. 2d at 158.

"It is all well and good to say, after the fact, that certain conversations were irrelevant and should

have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take." *United States v. Cox,* 462 F. 2d at 1301, *quoting United States v. LaGorga,* 336 F. Supp. at 196.

*See also United States v. Turner,* 528 F. 2d at 158; *United States v. Armocida,* 515 F. 2d at 45; *United States v. Scott,* 504 F. 2d at 198. "Wiretapping is imprecise because in the normal case the monitoring agent does not know exactly what he is going to hear until he hears it. Thus, most agents have been reluctant to unplug their earphones for fear that they will miss an important conversation." Low, *Post-Authorization Problems in the Use of Wiretaps: Minimization, Amendment, Sealing, and Inventories,* 61 *Corn. L. Rev.* 92, 96 (1975). In short, monitors are not gifted with extrasensory perception nor are they fortune-tellers. Only by hearing the conversation can it be determined to be privileged.

"The extent of judicial supervision," *Spease & Ross v. State,* 275 Md. at 100, 338 A. 2d at 291, and the "duration of the wiretap," *Id.,* lend credence to the State's contention in the matter now before us that proper steps were taken toward conformance with the minimization requirement of section 2518(5). A wiretap of only four (4) weeks duration was employed to break an interstate drug ring, and the "tap" was subject to twice weekly reports to the issuing judge. Furthermore, "the length of the calls monitored," *Id.,* was never shown to be excessive nor was there any proof that a "pattern of pertinent calls" emerged. *Id.*

Appellants also complain that calls between client and attorney were monitored in violation of the privileged nature of those conversations. While no aspersions were ever cast upon the character or involvement of appellants' attorney, the State found itself confronted with a conspiracy, the nature of which appeared to be such that there was a possibility that the content of the calls might have negated the privilege. Had the calls proven to be in furtherance of the crime, the attorney-client privilege would have been unavailable to the

parties. *Pollock v. United States,* 202 F. 2d 281 (5th Cir. 1953). If the police were required to cease all listening, recording, and spot-checking because the conversation appeared superficially to be a privileged communication, it would not be long before those involved in unlawful activity would circumvent the wiretap by creating the impression to the monitor that the conversation was a privileged communication irrespective of its content. The titles of "attorney," "doctor," "reverend," "priest," or "father" might well become underworld code words in order to defeat electronic interception.

In any event, in the case at bar, none of the conversations between attorney and client were ultimately transcribed or admitted into evidence. Appellants are unable to show prejudice resulting from the interception of those conversations, and we are unwilling to extend the sanction of suppression to all evidence because a justifiable suspicion turns out not to be fact.

We think there was no violation of the minimization provision of Title III. 18 U.S.C. § 2518(5) (1970). While minimization may not have been as strict as appellants would have wished or as the ideal situation prescribes, the Court will not judge the State's procedure by a rigid hindsight that ignores the problems confronting the monitors at the time of the investigation. Once the State succeeded in making a *prima facie* showing of reasonableness, it was then up to the appellants to show an alternative procedure that would have better minimized noncriminal conversations while still permitting the State to achieve its legitimate objective. *United States v. Quintana, supra.* The appellants made no such showing.

VI.

STRIKING OF JUROR FOR CAUSE.

Among the questions asked at *voir dire* were two (2) pertaining to the witnesses' opinions concerning electronic surveillance. The court inquired as follows:

"Is there any member of the Jury panel who believes

that a legally authorized electronic surveillance, commonly known as a wire tap, [*sic*] is unfair to obtain evidence in a criminal case? If so, please stand.

(No Response)

Is there any member of the panel who has any moral reasons or any reasons, or personal thought or convictions regarding the use of wire tap [*sic*] by the police, or would you accept it as any other evidence one way or the other, and the question should be, if you don't, if you feel that it is against your principles or otherwise, please stand?"

One venireman responded in the affirmative to the latter question and was then further examined by the court. The venireman stated, "I feel it's [wiretapping] an invasion of privacy as a citizen." He further said that even if the court ruled that there had been a legal wiretap, admissible in evidence, he would be unable to consider the wiretap like any other evidence. The venireman flatly noted that in his opinion a wiretap was "unjust. It's uncalled for. That's the way I feel." Inasmuch as the crux of the State's case consisted of the wiretap conversations, a prospective juror's refusal to consider such evidence constituted sufficient reason to strike him from the panel for cause.

Judge Arabian complied with the requirements set forth in *Witherspoon v. Illinois,* 391 U. S. 510, 88 S. Ct. 1770, 20 L.Ed.2d 776 (1968). In that case, the Court did allow exclusion for cause of those jurors who would absolutely *not consider* the death penalty. In the case *sub judice*, the venireman was not excused until the court had determined that he absolutely would not consider wiretap evidence or evidence derived therefrom. Bias toward a certain kind of evidence is a manifestation of a predisposition against guilt or innocence because of a reason extrinsic to the evidence. *McCree v. State,* 33 Md. App. 82, 363 A. 2d 647 (1976); *Tisdale v. State,* 30 Md. App. 334, 353 A. 2d 653 (1976). Thus, the trial judge properly struck the prospective juror for cause.

# VII.

## DEFENDANT MUST DEMONSTRATE THAT SHE CAME WITHIN STATUTORY EXCEPTION SET OUT IN MD. ANN. CODE ART. 27, § 279.

Appellant alleges that the State failed to prove that she did not come within the statutory exceptions to the controlled dangerous substance laws. Heroin, however, as a drug included in Schedule I of Md. Ann. Code, art. 27, § 279, is, at this point in time, deemed to have no legitimate or accepted medical use in the United States. Furthermore, when a statutory exception is claimed, it is encumbent upon the accused to demonstrate that he or she comes within the ambit of the exception. *Jordon v. State,* 24 Md. App. 267, 330 A. 2d 496 (1975), *cert. denied,* 274 Md. 729 (1975).

*Judgments affirmed.*
*Costs to be paid by appellant.*