CLARENCE MICHAEL SHINGLETON, DEBRA ANN
MARTIN AND CHARLES EDWARD BECHTEL v.
STATE OF MARYLAND

[No. 1132, September Term, 1977.]

*Decided June 9, 1978.*

528

The cause was argued before GILBERT, C. J., and DAVIDSON and LOWE, JJ.

*Arthur A. DeLano, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for

appellants Shingleton and Martin. *Thomas L. Hennessey* for appellant Bechtel.

*Michael A. Anselmi, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General,* and *Naji P. Maloof,* ₁State's *Attorney for Calvert County,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

Cole Porter, in his well-known song, *"I Get a Kick Out of You,"* proclaimed that "[s]ome get a kick from cocaine." This appeal arises from the arrest and conviction of some suppliers of that "kick."

Historically, this case began with an application for a "wiretap" order in Baltimore County. Judge Marvin Land issued the order pursuant to 18 U.S.C. §§ 2510-2520 (1970). After installation of the "tap," the police learned of a ring of people dealing in controlled dangerous substances spread from Woodlawn to Essex in Baltimore County to Lusby in Calvert County and beyond. The ring did, in fact, have Florida, Arizona, and Mexican connections.

Additional wiretap applications, founded upon the information obtained from the Baltimore County intercept order, led directly to the issuance of other electronic interception orders in Calvert County. The issuing judge authorized taps on a telephone listed to Appellant Clarence Michael Shingleton, a public "telephone booth located at . . . [the entrance to the] Chesapeake Ranch Club," and a telephone leased to Appellant Debra Ann Martin, all of Calvert County. From the record we infer that the appellants, Shingleton and Martin, resided in the same building.

The result of the electronic surveillance of the three (3) telephones led to the conclusion on the part of the Maryland State Police that Martin, Shingleton, and Appellant Charles Edward Bechtel were engaged in the nefarious business of bringing cocaine into Maryland and distributing it, contrary to the provisions of Md. Ann. Code art. 27, §§ 276-302.

The State Police learned that on October 15, 1976, Martin was to drive her van-type motor vehicle to Dulles Airport in

Virginia for the purpose of meeting Shingleton, who was transporting cocaine and marijuana into Maryland. After the van, with Martin and Shingleton aboard, left Dulles and traveled into Maryland, it was halted by the State Police at the Capitol Center, Prince George's County. The occupants were arrested. The vehicle and its contents were seized and searched, and it was ascertained that Shingleton was indeed carrying cocaine and marijuana into this State in a briefcase which was opened by one of the troopers. The vehicle was transported to a garage where it was thoroughly searched.

It is enough to know, without endeavoring to recount all the evidence produced on behalf of the State against Bechtel, that the taped conversations, if admissible into evidence, were more than enough to demonstrate that Bechtel was an integral part of a conspiracy to violate this State's narcotics and dangerous substances laws.

A jury, in the Circuit Court for Calvert County, convicted Shingleton and Bechtel of conspiracy both to possess cocaine and to possess it with intent to distribute it. All three (3) appellants were found not guilty of the count charging conspiracy to distribute. The jury was unable to agree as to Martin's involvement in the conspiracy case. Shingleton and Martin were convicted of the possession of other proscribed controlled dangerous substances. All three (3) appellants have carried their grievance to this Court. Once here, the appellants parted company in their method of attack upon the judgments of the circuit court. Shingleton and Martin have elected to pursue a four-fold attack upon the judgments of the circuit court, while Bechtel mounts a fullscaled eleven-pronged salvo against it.

We shall deal first with the issues posed in the Martin-Shingleton appeal.

## I.

"The trial judge erred in admitting evidence
derived from unlawful wiretaps."

The appellants correctly assert that the electronic interception in this case was controlled by Title III of the

Omnibus Crime Control and Safe Streets Act of 1968. (18 U.S.C. §§ 2510-2520 (1970)).[1]

Section 2518(1)(c) provides that each application for an electronic surveillance warrant shall contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. . . ." We, in *Calhoun v. State*, 34 Md. App. 365, 374, 367 A. 2d 40, 44-45 (1977), referred to the legislative history of the Act, which discloses:

> " 'Subparagraph (c) requires a full and complete statement as to whether or not normal investigative procedures have been tried and failed or why these are unlikely to succeed if tried, or to be too dangerous. . . . The judgment would involve a consideration of all the facts and circumstances. Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspirational groups by undercover agents or informants. Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. What the provision envisions is that the *showing be tested in a practical and common sense fashion.'* [1968] U.S. Code Cong. & Admin. News at 2190 (emphasis added) (citations omitted)."

We said in *Calhoun* that:

> "Courts are not free to infer from the mere presentation of an application or petition, supported by an affidavit, that normal investigative procedure will not work. There must be specific compliance

---

1. Effective July 1, 1977, Maryland adopted its own "Wiretapping and Electronic Surveillance Act" in the Courts and Judicial Proceedings Article §§ 10-401—10-412, inclusive. *See* Poore v. State, 39 Md. App. 44, 384 A. 2d 103 (1978).

with 18 U.S.C. § 2518. The affidavit *must* demonstrate to the issuing judge that normal investigative measures have been tried and failed, *or* they are unlikely to be successful under the circumstances, *or* that their use is too perilous to the investigators. That a prior affidavit for another time and place so demonstrates, even when incorporated by reference, is not compliance with the strict requirements of the Act." 34 Md. App. at 376-77, 367 A. 2d at 46. (Original emphasis.)

The record reflects that the issuing judge determined that normal investigative methods would not work, and for that reason he issued the orders as to the Martin and Shingleton telephones. The judge based his finding upon the affidavit in support of the State's Attorney's application for the order. Thus, it is to the affidavit that we must look to determine whether it complied with section 2518(1)(c). Trooper First Class, Iran M. Perkins, Intelligence Division, Narcotic Section, Maryland State Police, supplied a forty-one (41) page affidavit in which he recounted the history of the investigation into this particular narcotics ring. He related that as a result of an order issued by Judge Land in the Circuit Court for Baltimore County, a pen register was placed on the telephone line of one Edgar Allen Crouch of Woodlawn. The register showed thirty (30) calls in three (3) months to the telephone listed to Martin. Shingleton was disclosed by informants to be Crouch's supplier. Crouch was observed by an informant "obtaining drugs from Shingleton," and Shingleton told the informant that Shingleton, in turn, received the drugs from Appellant Charles Edward Bechtel. Crouch, Shingleton, and Bechtel all had records of narcotics violations. The house in which Martin and Shingleton lived was "approximately 500 feet off of the road down a long dirt driveway. . . . The house is not visible from the road."

The pen register led to a tap on Crouch's telephone. From that tap it was learned that Shingleton would meet Crouch in Crofton, Maryland, and furnish Crouch with narcotics. The actual transfer was witnessed by three (3) police officers. Perkins, in his affidavit, said that he and other police

personnel had "conducted surveillances of . . . Shingleton, . . . Martin and . . . [their] residence." Because of the location of the residence, "the occupants of the surrounding area, as well as Shingleton and Martin, become extremely suspicious of any and all strange persons or vehicles that are continually in the area." A fixed surveillance was virtually impossible. Establishing a conspiracy among the appellants was not possible without the use of the tap because Bechtel was a fugitive from Maryland [2] and did not enter the State. While ample evidence had already been obtained to prosecute successfully Shingleton, absent the electronic interception, the police would be without a method of gathering evidence to establish the conspiracy involving Bechtel. The affidavit specifically recited that it was Perkins' opinion that other investigative methods would not work. The issuing judge agreed and so do we.

We think the affidavit clearly established the reasons why it was necessary to use the wiretap. The physical location of the property in which appellants Shingleton and Martin resided and Bechtel's being in another State made it manifest that the only method that could be successfully used in bringing about the apprehension of all three (3) on the conspiracy charges was electronic surveillance.

In our view, the affidavit passes muster under *United States v. Giordano,* 416 U. S. 505, 94 S. Ct. 1820, 40 L.Ed.2d 341 (1974) and *Calhoun v. State, supra.* We perceive no error.

Our task, however, does not stop here because appellants advance a second reason why the wiretap evidence should not have been received. At 3:35 p.m., on Friday, September 10, 1976, one of the State Troopers assigned to the electronic surveillance of the Martin-Shingleton telephone, called the judge on the telephone and informed him, according to the judge's memorandum, that the trooper "had learned from the conversations previously intercepted" that at "5:00 PM today (1700 hrs)" a telephone call would be received by Shingleton "at a pay phone in the Ranch Club area." The subject of the

2. At oral argument, the question of whether Bechtel was a fugitive from this State was disputed. Counsel for Bechtel asserted that his client was not a fugitive inasmuch as the charges which inferentially led to Bechtel's voluntary absence from the State had been stetted.

call was reportedly "prices and times of delivery of CDS material and that there was not sufficent [*sic*] time to prepare and submit a request to tap this phone to intercept this call in the usual way. Because of the time required to set up the aparatus [*sic*], the distance from where he was to where I was and the fact that because of a prior committment [*sic*] I would not be available more than another half hour *I verbally authorized him to intercept this call upon condition that all of this would be reduced to writing in due course."* (Emphasis supplied.)

The State seeks to justify the verbal request for and the oral granting of the tap on the basis of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified as 18 U.S.C. § 2518(7). That section provides:

"Notwithstanding any other provision of this chapter, *any investigative or law enforcement officer, specially designated by the Attorney General or by the principal prosecuting attorney of any State or subdivision thereof* acting pursuant to a statute of that State, who reasonably determines that —

'(a) an emergency situation exists with respect to conspiratorial activities threatening the national security interest or to conspiratorial activities characteristic of organized crime that requires a wire or oral communication to be intercepted before an order authorizing such interception can with due diligence be obtained, and

'(b) there are grounds upon which an order could be entered under this chapter to authorize such interception,

may intercept such wire or oral communication if an application for an order approving the interception is made in accordance with this section within forty-eight hours after the interception has occurred, or begins to occur. In the absence of an order, such interception shall immediately terminate

when the communication sought is obtained or when the application for the order is denied, whichever is earlier. In the event such application for approval is denied, or in any other case where the interception is terminated without an order having been issued, the contents of any wire or oral communication intercepted shall be treated as having been obtained in violation of this chapter, and an inventory shall be served as provided for in subsection (d) of this section on the person named in the application." (Emphasis supplied.)[3]

The State's argument will not withstand scrutiny. There is absolutely nothing in the record to show that the trooper who sought the "emergency" intercept order was "specially designated ... by the principal prosecuting attorney of" Calvert County. Moreover, the alleged "conspiratorial activities" did not threaten the national security nor does the alleged criminal activity of the appellants fall within the ambit of the meaning of "Organized crime" as that term was defined by the Congress in Title I of the Omnibus Crime Control and Safe Streets Act of 1968. "Organized crime" is defined in 42 U.S.C. § 3781(b) (1970), to mean "the unlawful activities of the members of a highly organized, disciplined association engaged in supplying illegal goods and services, including but not limited to gambling, prostitution, loan sharking, narcotics, labor racketeering, and other unlawful activities of members of such organizations." We agree that the alleged conspiracy among Bechtel, Martin, and Shingleton might be considered to be "organized," but their purported illegal conduct falls short of being a "highly organized, disciplined association." The definition that the Congress employed conjures up mental images of crime syndicates presided over by a "Godfather," "don," "boss," "chief," and the like. It may or may not be a part of the Mafia, Camorra, Cosa Nostra or any of their American cousins, but it most certainly does not cause one to ideate a conspiratorial trio whose purpose is to violate successfully this State's

3. The Maryland Wiretapping and Electronic Surveillance Law, Md. Cts. & Jud. Proc. Code Ann. §§ 10-401—10-412, contains no such exception.

controlled dangerous substances laws. In our view, the Congressional definition of organized crime does not contain sufficient elasticity to allow it to be stretched to include the type of conspiracy charged in the instant case.

Because the verbal application and oral order thereon is not within the scope of the exception, 18 U.S.C. § 2518(7), to the obtaining of a written intercept order, it was absolutely worthless. It flew straight into the face of the Omnibus Crime Control and Safe Streets Act of 1968 despite the judge's good intent. The federal act prescribes, in section 2518(1), that:

> "Each application for an order authorizing or approving the interception of a wire or oral communication *shall be made in writing* upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application...." [4] (Emphasis supplied.)

Except for provisions of section 2518(7) permitting verbal application and orders, which we have found to be inapplicable to the case *sub judice,* there are no other exigent circumstances, real or fancied, which allow an oral intercept order. The fact that the Congress mandated that such orders be "in writing upon oath or affirmation," section 2518(1), evidences that the Congress desired, under all circumstances save section 2518(7), in which the federal act was employed,[5] to guarantee proper, before the fact, judicial review of the affidavit, application and the proposed order. *State v. Siegel,* 266 Md. 256, 274, 292 A. 2d 86, 95 (1972), declares "[t]he statute [Title III 18 U.S.C. §§ 2510-2520] sets up a strict procedure that *must* be followed and we will not abide any deviation, no matter how slight, from the prescribed path." (Original emphasis.) *See also Poore v. State,* 39 Md. App. 44, 47, 384 A. 2d 103, 106 (1978). In *Poore,* we pointed out the distinction between the strict pre-order compliance dictated by *Siegel* and the substantial post-order compliance, absent prejudice to the accused, sanctioned by *Spease v. State,* 275

---

4. A similar provision is contained in Md. Cts. & Jud. Proc. Code Ann. § 10-408 (a) (Cum. Supp. 1977).

5. The same rationale is applicable to the current Maryland statute.

Md. 88, 338 A. 2d 284 (1975). *Poore v. State,* 39 Md. App. at 51-61, 384 A. 2d at 108-14.

Unquestionably, the verbal order in the case *sub judice* was governed by the strict pre-order compliance prescribed by *Siegel.* The order fails to meet that requirement and is, as we have already noted, totally invalid. We look with much disfavor upon the procedure used in the instant case, both as to the application for the order and the authorization of the interception. We note that had the application and order been made subsequent to July 1, 1977, there would not have been the slightest argumental justification for the issuance of such an order because the Maryland law does not recognize the "emergency situation" exception specified in 18 U.S.C. § 2518 (7).

The Fourth Amendment, as has been said many times over, prohibits "unreasonable government intrusions into . . . legitimate expectations of privacy." *United States v. Chadwick,* 433 U. S. 1, 7, 97 S. Ct. 2476, 2481, 53 L.Ed.2d 538, 546 (1977). The Congress, in its capacity as representative of the populace wrote into the Omnibus Crime Control and Safe Streets Act of 1968, what it perceived to be adequate safeguards of the right of the people to be free from governmental or private electronic interloping. It carefully spelled out the judicial function of prior approval of wire or electronic eavesdropping and interception, as well as the post-order procedure to be followed. Simultaneously, it forbade private persons to manufacture, possess and distribute devices "primarily useful for the purpose of surreptitious interception of wire or oral communications. . . ." 18 U.S.C. § 2512(1).

When individual constitutional rights are rendered nugatory in the interest of expediency, then the Constitution, itself, may as well be thrown upon a scrap pile, and we declare that cases are to be decided on the basis of what is in the best interest of the State. Such a step would be, in actuality, a giant-sized stride away from the concept formulated by our ancestors, when they adopted the Bill of Rights, and a synchronous move toward the non-democratic principle that

what is good for the State is good for everybody. We emphatically decline to take any step toward that end.

If the facts in this case ended with the illegal interception of that particular telephone call, we would quickly strike down the order and direct that the evidence derived therefrom be suppressed. The record discloses, however, that while there was an interception made as a result of the oral order, there was no transcript of that call nor was its content made known to the jury. While it might be argued that the unlawfully overheard conversation formed the base of a pyramid, there is nothing but pure conjecture to support such an hypothesis. Indeed, in the light of the admissible evidence contained in fifty-eight (58) transcriptions, many of which were made before the oral authorization under attack, the pyramid theory disintegrates. Consequently, even though the verbal order was manifestly wrong, there is no reversible error inasmuch as the appellants have sustained no demonstrated prejudice therefrom.

## II.

"The evidence was insufficient to sustain ... [Martin's and Shingleton's] convictions for possession of various controlled dangerous substances."

On the strength of a search and seizure warrant, the house in which Martin and Shingleton resided was searched for contraband. Quantities of lysergic acid diethylamide (LSD), marijuana, opium, and amphetamines were found in the residence.

The record shows that the keys to the house were obtained from Martin. That she and Shingleton shared the residence is beyond serious dispute. There is no evidence that anyone else lived with them. The tape recordings of intercepted conversations demonstrates Martin's knowledge of Shingleton's illicit activities.

The test for the sufficiency of the evidence has been stated by this Court on many occasions to be "whether the admissible evidence adduced at trial shows directly or

supports a rational inference of the facts to be proved, from which the jury could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged." *James v. State,* 14 Md. App. 689, 694, 288 A. 2d 644, 647 (1972). (Citations omitted.)

If the evidence in the case now before us were visualized as water being poured into a bucket, representing sufficiency, the bucket was not only filled to capacity, but it overflowed.

## III.

"The trial judge erred in admitting evidence obtained from the warrantless search of Shingleton's briefcase."

When the van in which Martin and Shingleton were riding was halted by the Maryland State Police, a briefcase that had been carried by Shingleton when he exited the aircraft and entered the vehicle was seized along with the van. The appellants assert that under the Supreme Court's holding in *United States v. Chadwick, supra,*[6] a search and seizure warrant was necessary in order for the police to open and search the briefcase. The State, on the other hand, views the search as permissible under the so-called automobile exception. *Chambers v. Maroney,* 399 U. S. 42, 90 S. Ct. 1975, 26 L.Ed.2d 419 (1970).

In *Chadwick,* railroad officials in San Diego saw two (2) men "load a brown footlocker onto a train bound for Boston." 433 U. S. at 3, 97 S. Ct. at 2479, 53 L.Ed.2d at 543. The trunk appeared to be very "heavy for its size," *Id.,* and "it was leaking talcum powder, a substance often used to mask the

---

6. Although *Chadwick* was handed down subsequent to the trial of the case *sub judice,* we believe its decision, reaffirming established standards of search and seizure, may be viewed retroactively in accordance with the considerations set forth in Stovall v. Denno, 388 U. S. 293, 297, 87 S. Ct. 1967, 1970, 18 L.Ed.2d 1199, 1203 (1967):

"The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."

*See* Rassmussen v. State, 18 Md. App. 443, 448-50, 306 A. 2d 577, 580 (1973); Scott v. State, 7 Md. App. 505, 516-18, 256 A. 2d 384, 391-92 (1969).

odor of marihuana or hashish." *Id.* One (1) of the men who loaded the footlocker onto the train "matched a profile used to spot drug traffickers." *Id.* The railroad official notified federal agents in San Diego and they in turn alerted "their counterparts in Boston." *Id.* Two (2) days later, when the train arrived in Boston, federal agents were waiting for it. The same two (2) men who had loaded the trunk in San Diego were observed claiming "their suitcases and the footlocker, which had been transported by baggage cart from the train to the departure area." *Id.* at 3-4, 97 S. Ct. at 2479, 53 L.Ed.2d at 543.

When the footlocker was lifted from the car and set upon the floor, a dog, especially trained in the detection of marijuana, apparently approached the footlocker and "signaled the presence of a controlled substance inside." *Id.* at 4, 97 S. Ct. at 2479, 53 L.Ed.2d at 543. The locker was carried by the two (2) suspects to Chadwick's waiting vehicle. The footlocker was placed in the trunk of the car. Before the trunk of the car was closed, the federal agents effected the arrest. Chadwick's vehicle was removed to the Federal Building in Boston where a warrantless search was made of the double locked footlocker. The Court, speaking through the Chief Justice, discussed the history of the Fourth Amendment, noting that its purpose is to protect "people, not places." *Id.* at 7, 97 S. Ct. at 2481, 53 L.Ed.2d at 546. Pointing out that the Government did "not contend that the footlocker's brief contact with Chadwick's car makes this an automobile search," *Id.* at 11, 97 S. Ct. at 2483-84, 53 L.Ed.2d at 548, the Court went on to hold that:

> "*Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.*" (Footnote omitted.) *Id.* at 15, 97 S. Ct. at 2485, 53 L.Ed.2d at 551. (Emphasis supplied.)

The instant case presents us with a situation not too distantly related to *Chadwick.* Although the Maryland State Police possessed a warrant to search Martin's van, the warrant had been issued in Calvert County. It could not validly be and was not served in Prince George's County. *Gattus v. State,* 204 Md. 589, 105 A. 2d 661 (1954).[7] No search warrant was obtained in Prince George's County, and there is no reason for the non-obtention present within the record.

When the van was stopped by the police, the occupants were removed from the vehicle and placed under arrest. A quick warrantless search was conducted on the spot. The State Police discovered the briefcase and opened it. As we read *Chadwick,* the contents of the briefcase were protected by the cloak of the Fourth Amendment. Plainly, a briefcase is more like luggage, about which *Chadwick* holds that one has a right of expectation of privacy, than like a motor vehicle, a highly mobile object, usually open to view and in which one may reasonably expect less privacy. Moreover, there is no testimony of any emergency requiring the warrantless search of the briefcase. The officers did not express any fear or apprehension over weapons or explosives. The only remaining justification for the intrusion into the briefcase was the possibility that the contents would be destroyed by the two (2) appellants who were arrested at the scene. Those two (2), Martin and Shingleton, were in custody and, inferentially, unable or incapable of destroying the briefcase's contents. The sum and substance of the facts being that, in this case, no justification existed for the warrantless search of the briefcase. *Chadwick v. United States, supra; Preston v. United States,* 376 U. S. 364, 84 S. Ct. 881, 11 L.Ed.2d 777 (1964).

We are mindful of a number of cases seeming to justify such a search as that present in this matter on the theorem of search incident to an arrest. *Cady v. Dombrowski,* 413 U. S. 433, 93 S. Ct. 2523, 37 L.Ed.2d 706 (1973); *Coolidge v. New Hampshire,* 403 U. S. 443, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971); *Chambers v. Maroney, supra; Chimel v. California,* 395 U. S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969). *See also Terry*

7. *Gattus* holds that a "search must be made within the limits of the jurisdiction of the judge . . . issuing the same. A search warrant cannot have extra territorial effect." 204 Md. at 595, 105 A. 2d at 664.

542

*v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968); *Mobley v. State,* 270 Md. 76, 310 A. 2d 803 (1973); *aff'g King v. State,* 16 Md. App. 546, 298 A. 2d 446 (1973). The rationale for upholding warrantless searches made incident to arrest is the safeguarding of the arresting officers or preventing the loss of evidence. That proposition evaporates in view of the separation of the briefcase from the arrestees.[8] Because, in the case *sub judice,* the clear and present danger to the police and the likelihood of destruction of the evidence were dispelled by the separation of the appellants, Martin and Shingleton, from the van and, obviously, from the briefcase, there was no need for a warrantless search of the briefcase. *United States v. Chadwick, supra; Preston v. United States, supra.*[9]

Under the circumstances of this case, the police should have obtained a search warrant before opening and searching the briefcase, and the trial court erred in admitting the contents of the case into evidence.

Although there was ample authority, as Mr. Justice Blackmun observed in his dissent in *Chadwick,* for the position that a briefcase in a car may be searched as part of the "automobile exception" expounded by *Carroll v. United States,* 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925); *see e.g., United States v. Tramunti,* 513 F. 2d 1087 (2d Cir. 1975) (suitcase in back seat of a car); *United States v. Issod,* 508 F. 2d 990 (7th Cir. 1974), *cert. denied,* 421 U. S. 916 (1975) (trunk in railroad station); *United States v. Soriano,* 497 F. 2d 147 (5th Cir. 1974) (*en banc*) (suitcases in trunk of taxicab); *United States v. Evans,* 481 F. 2d 990 (9th Cir. 1973) (footlocker in trunk of automobile), nevertheless, to the extent those cases

8. No attempt was made by the State to justify the search of the van on the basis of an "inventory search" for the purpose of protecting both the police and the property owner. *See* Waine v. State, 37 Md. App. 222, 377 A. 2d 509 (1977).

9. Prior to *Chadwick,* the Court, in Preston v. United States, *supra,* considered a factual situation where three (3) men were charged with vagrancy and "were under arrest at the police station and the car was in police custody at a garage, . . . [so that there was no danger] that the car would be moved out of the locality or jurisdiction." 376 U. S. at 368, 84 S. Ct. at 884, 11 L.Ed.2d at 781. Thus, the subsequent search of the vehicle was too remote in time and place to the arrest to be a search incident to that arrest. *See* J. Cook, *Constitutional Rights of the Accused Pre-Trial Rights* § 61 (1972).

conflict with *Chadwick,* they are implicitly laid to rest. The law is now clear that the police, having gained "exclusive control" of the briefcase and eliminated by space and time any possibility of the arrestee's "gain[ing] access to the property to seize a weapon or destroy evidence," may not then conduct a warrantless search of that property under the guise of a search incident to the arrest. *United States v. Chadwick,* 433 U. S. at 15, 97 S. Ct. at 2485, 53 L.Ed.2d at 551; *Preston v. United States, supra.* Hence, the briefcase and its contents should have been suppressed and it is reversible error for the trial judge not to have excluded that illegally seized evidence.

## IV.

"The trial judge abused his discretion in questioning Trooper Porter as to his interpretation of a wiretap conversation."

Shingleton alleges that the trial judge "crossed the line of impartiality" in his questioning of the State Trooper. It is the duty of the trial judge to endeavor to see that evidence is clear to the jury. We do not believe the judge crossed the threshold of impartiality in questioning the trooper. In any event, the attack is directed to the wiretap. The wiretap is connected with the conspiracy to possess cocaine, and we have already indicated our reversal of those convictions. The impartiality threshold crossing is thus purely academic.

## V.

Reversal being declared, we would ordinarily halt our discussion at that point. In this case, however, we deem it advisable to express another reason why this judgment must be reversed. Bechtel poses the following issue:

"The court erred in denying the appellant's motion for severence, [*sic*] timely filed."

Prior to trial, Bechtel moved to sever his case from that of Martin and Shingleton. Patently, the reason for the motion was that Bechtel was concerned over the other charges that had been filed against his co-defendants. He feared that the

possession of proscribed narcotics evidence against Martin and Shingleton would spill over onto him to such an extent that the jury would have difficulty separating the wheat from the chaff, thereby causing him to be subject to guilt by association. The judge's declination to sever the cases, he asserts, denied him a fair and impartial trial. We agree with Bechtel, and we add that at oral argument, the State submitted that "there are no Maryland cases which would justify joinder in this case." The State did, however, urge us to adopt the view of federal courts [10] and hold the joinder to be permissible. In order to follow that course, we would have to overrule our holding in *Wilson v. State,* 8 Md. App. 653, 262 A. 2d 91 (1970), and ignore the decisions of the Court of Appeals in *McKnight v. State,* 280 Md. 604, 375 A. 2d 551 (1977), *rev'g* 33 Md. App. 280, 364 A. 2d 116 (1976); *McChan v. State,* 238 Md. 149, 207 A. 2d 632 (1965); and *Lewis v. State,* 235 Md. 588, 202 A. 2d 370 (1964). We possess neither the inclination to overrule *Wilson* nor the power to ignore, thus implicity overruling, *McKnight, McChan,* and *Lewis.*

Md. Rule 745 c provides:

> "If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents or defendants, the court may, upon its own motion or the motion of any party, order separate trials of counts, charging documents or defendants, or grant any other relief justice requires." [11]

In *McChan,* the Court of Appeals pointed out that McChan "was put on trial with his codefendants in four cases in which he was charged jointly with at least two other defendants, and in three cases in which he was not charged at all. . . ." 238 Md. at 160, 207 A. 2d at 639. The Court was of the view that joinder was prejudicial and reversed. *Id.*

---

**10.** *See* United States v. Laca, 499 F. 2d 922 (5th Cir. 1974); United States v. Isaacs, 493 F. 2d 1124 (7th Cir. 1974); United States v. Leach, 429 F. 2d 956 (8th Cir. 1970); Haggard v. United States, 369 F. 2d 968 (8th Cir. 1966); Wiley v. United States, 277 F. 2d 820 (4th Cir. 1960); Scheve v. United States, 184 F. 2d 695 (D.C. Cir. 1950).

**11.** At time of trial, joinder and severance were controlled by then Md. Rules 734 and 735. By Chapter 700, effective July 1, 1977, those two (2) rules were consolidated into Md. Rule 745.

*Lewis* reversed judgments of the Criminal Court of Baltimore because the trial judge refused to sever Lewis's case from that of co-defendants. The Court reasoned that "all of the defendants . . . were not 'alleged to have participated in the same act or transaction or in the same series of acts or transactions' which constituted the offenses . . . [charged in various] indictments. . . ." 235 Md. at 590-91, 202 A. 2d at 371.

Judge Levine, for the Court of Appeals in *McKnight,* noted that "[a]t the very least, the joinder of multiple charges may produce a latent hostility, which by itself may cause prejudice to the defendant's case." 280 Md. at 609, 375 A. 2d at 554. The Court went on to opine that "a defendant charged with similar but unrelated offenses is entitled to a severance where he establishes that the evidence as to each individual offense would not be mutually admissible at separate trials." 280 Md. at 612, 375 A. 2d at 556.

Certainly, the evidence concerning the possession of proscribed controlled dangerous substances, seized from the residence of Martin and Shingleton, and in no manner connected with Bechtel, would not have been admissible against Bechtel in a separate trial for the conspiracy to possess cocaine. *Wilson v. State,* 8 Md. App. at 665-66, 262 A. 2d at 98-99.

The non-conspiratorial offenses of Martin and Shingleton were unrelated to the offenses for which Bechtel was called to account. Directing that he stand trial along with Martin and Shingleton on the conspiracy charges was entirely proper, but compelling him to stand trial, at the same time that other substantive charges, unconnected with Bechtel, were being pressed against Martin and Shingleton served no useful purpose except to save the costs of another jury trial. That economy may not be employed to deprive Bechtel of his right to a separate trial. We think the trial judge abused his discretion in refusing the severance.

Irrespective of what the law may be elsewhere, it is clear in this State that an accused may not be required to stand trial either on a series of unrelated offenses, wherein the evidence is shown not to be mutually admissible, *McKnight v. State,*

*supra,* or with co-defendants who are also being tried for other offenses not related to the accused, if the evidence relative to those "other offenses" will prejudice the accused. *Wilson v. State, supra.*

In view of our holding, it is not necessary to discuss the remaining potpourri of issues raised by Bechtel inasmuch as they are not likely to be presented in any subsequent trial.

From what we have said, the "bottom line" is that judgments entered on the conspiracy to possess cocaine are reversed and remanded for a new trial as to Bechtel, and Shingleton. The judgments against Martin and Shingleton for possession of LSD, marijuana, opium, and amphetamines is affirmed.

> *Judgments on criminal trials C-76-61 and C-76-68 reversed and cases remanded for a new trial.*
>
> *Judgments on cases C-76-63 and C-76-64 affirmed.*
>
> *Two-thirds (²/₃) of the costs to be paid by Calvert County.*
>
> *One-third (¹/₃) of the costs to be paid by appellants Shingleton and Martin.*