ELLEN PANKEY BOLDEN AND CAREY STUART
TAYLOR *v.* STATE OF MARYLAND

[No. 433, September Term, 1979.]

*Decided February 7, 1980.*

644

The cause was argued before LISS, WILNER and MACDANIEL, JJ.

*Arthur A. DeLano, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant Ellen Pankey Bolden. *Arthur M. Ahalt,* with whom were *Goldstein, Ahalt & Bennett, Chartered* on the brief, for appellant Carey Stuart Taylor.

*Thomas P. Barbera, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Thomas A. Blair, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

On December 21, 1977, an indictment was returned by the Grand Jury for Prince George's County charging nine defendants with conspiracy to violate the Controlled Dangerous Substances Act of Maryland, conspiracy to distribute cocaine, conspiracy to possess cocaine with intent to distribute, and conspiracy to possess cocaine. Carey Stuart

Taylor and Ellen Pankey Bolden, appellants, were two of the indicted co-conspirators.

An important portion of the evidence offered by the State was based on intercepted telephone communications involving a number of the indicted defendants. A motion, timely filed, was offered to suppress evidence obtained by the wire communications intercepted by the State pursuant to court authorized wiretaps, and a hearing was held before Judge Howard S. Chasanow, who denied the motion to suppress.

Appellants Taylor and Bolden were tried by a jury in the Circuit Court for Prince George's County and were convicted of conspiracy to distribute cocaine. Sentences were imposed on each of the defendants, and it is from these judgments that this appeal is filed.

Appellants raise eight issues to be determined by this appeal. They are:

I. Did the trial court err in denying appellant's motion for judgment of acquittal made at the close of the State's case when the indictment charged a single conspiracy and the proof at trial disclosed multiple conspiracies?

II. Did the trial court err in denying appellant's motion for separate trial when the evidence showed multiple conspiracies and not a single overall conspiracy between Carey Stuart Taylor, Ellen Pankey Bolden and others?

III. Did the trial court err in allowing the State, at the close of all the evidence, to amend the indictment, over objection by the appellant, by striking from the indictment the names of indicted co-conspirators?

IV. Did the trial court err in refusing to instruct the jury that the mere distribution of cocaine from Carey Stuart Taylor to Amos Steve Tinker for Mr. Tinker's personal use, on September 27 and October 1, 1977, by itself, was not sufficient evidence to prove a conspiracy between Carey Stuart Taylor and Amos Steve Tinker?

V. Did the trial court err in refusing to instruct the jury that if the jury found multiple conspiracies to exist in the instant case and not a single overall conspiracy, as alleged in

the indictment, that the jury must return a verdict of not guilty as to the appellant?

VI. Did the trial court err in granting the State's motion for continuance of trial date, over objection, when the basis for the motion for continuance was to attempt to obtain additional probative evidence against the appellant when the State had not exercised reasonable diligence to secure the evidence prior to trial?

VII. Did the trial court err in refusing to suppress for use as evidence all telephonic communications intercepted between September 30, 1977 and October 3, 1977 when the order of court authorizing the interception of telephonic communications covered telephone number 891-2926 and the evidence reflected that Amos Tinker changed his telephone number to 891-2460 on September 30, 1977?

VIII. Did the trial court err in failing to suppress all wiretap evidence in light of the State's failure to obtain a sealing order immediately following the expiration of the wiretap orders?

## I, IV and V

The State contends that the alleged conspiracy to violate the Controlled Dangerous Substances Act began in April of 1977. At that time, Amos Tinker had an eighth of a kilogram of cocaine which was "stashed" in the home of Ellen Pankey Bolden, one of the appellants. This cocaine was to be delivered to certain unspecified individuals. In June, 1977, Ramsey Harris, Jr. (an indicted co-conspirator) was advised by Tinker that Bolden would sell him some cocaine, which Bolden later did. In August of 1977, Harris paid Tinker and Bolden for cocaine which was delivered to him by Tinker. After each of these sales, Harris sold the cocaine obtained from Bolden and Tinker to purchasers unknown to the suppliers. Appellant Taylor became involved in the conspiracy in September of 1977. On September 27, 1977, Tinker asked Taylor to supply him with some cocaine for his personal use. Taylor engaged one Leonard Lee on the phone, and Tinker gave Lee directions to reach his home.

In late September of 1977, Tinker was awaiting a shipment of drugs from a supplier in Miami, Florida later identified as Jorge Puga. On September 28, Tinker told Harris he had been unable to contact his supplier. On September 30, Tinker advised Taylor he still had not reached his source and that he needed more drugs for his own use. The police set up surveillance of Tinker's home and observed Tinker and Taylor walk to Taylor's car where he handed a lunch-sized paper bag to Tinker. In early October, Tinker told Bolden that he had not heard from his supplier at that time. Sometime between October 9, 1977 and October 13, 1977, Tinker finally reached his supplier.

The State's theory of the case was that Taylor was the "money man" who supplied the funds to purchase the illegal narcotics. Tinker advised Taylor he had finally been able to contact "his other brother" and asked Taylor "how far do you want me to go?" Taylor told Tinker he could purchase two kilograms. Tinker then called Bolden and told her he would call his "other brother" that night at about 9:00 p.m. At about 8:00 p.m., Tinker left his own home and drove to the home of Jane Busch (indicted as Jane Busch Johnson) and made two phone calls from her home to a number for Puga in Miami. Later that evening, a collect phone call was made and accepted from a Miami number to the phone in Busch's home. At 6:30 p.m. on October 13, Tinker drive to Bolden's home and gave her $100 for receiving his phone calls. The evidence indicated that Tinker had paid Bolden $600 over a period of time for accepting his phone calls.

The following day, Tinker called Taylor and told him he had ordered "it." Tinker then began his arrangements to pick up the two kilograms of cocaine. On October 14, 1977, he told Denise Hackett (another indicted co-conspirator) to make travel arrangements to Florida for Daniel Tinker (brother of Amos Tinker and an indicted co-conspirator) and herself. Amos Tinker also instructed her how to dress for the trip to and from Florida. In the course of the conversation between them, he told Denise that Taylor was bringing him some money. Tinker's arrangement with his brother, Daniel, was that he was to be paid $1,000 for picking up the drugs in

Miami and returning with them to Washington. On October 14, Amos Tinker got cold feet and notified Hackett and Bolden that he "might go talk to the man and postpone the trip" and after advising Denise he "had his man sitting with him," aborted the trip to Miami.

At this point in the evidence the State introduced testimony which showed Bolden's further involvement in Tinker's drug activities. The witnesses testified that Bolden was employed as a police officer in the Metropolitan Police Department and that during the period of time pertinent to this case was assigned as a dispatcher for the Department. One of the State's witnesses testified that the Department had access to a Naddis computer which stored information about past and present narcotic distributors. On October 14, 1977, during a telephone conversation Tinker asked Bolden to "find out if there's something on me." The following day Tinker was advised by Bolden that there was nothing there. Two hours later Bolden assured Tinker she could not have been mistaken in the information she gave him because she had used the computer. On October 16, Tinker again asked Bolden to check before he committed himself to the drug venture. Several additional conversations ensued between Bolden and Tinker in which she assured Tinker there was nothing on him in the computer. Tinker, in the latter part of October, began to reschedule the trip to Florida. He set up the plan with Daniel Tinker and Denise Hackett and called Taylor to "get my belongings that you brought me by mistake last week." Taylor agreed to supply Tinker with $44,000 toward the purchase of a quantity of cocaine.

On October 31, 1977, Daniel and Amos Tinker and Denise Hackett traveled by air to Miami, Florida where they were met by an unidentified male at the airport who drove them to his house. There Denise and Daniel changed into other clothes for the return bus trip. Prior to their departure from the house, Amos gave Daniel a zippered travel bag containing cocaine. Daniel and Denise then boarded a bus for the return trip to Washington, D.C.

On November 1, 1977, Amos Tinker called Ramsey Harris, Jr. and advised him he had a quantity of drugs ready for

distribution and suggested Harris come to his home to complete a deal. Tinker then called Taylor and advised that "he was all right" and that the deal had been made in Florida. Later that evening, Denise called Amos to advise him that she and Daniel were home. Daniel was advised to pick up the cocaine and take it to Daniel's apartment. At about 2:00 a.m. on November 2, Daniel, Amos and Denise met at Daniel's apartment. Amos took four large bags, each containing one kilogram of cocaine, out of the locked zippered bag. Amos separated the cocaine from two of the larger bags into smaller quantities and placed the smaller quantities into other plastic baggies. He placed the smaller bags and the two large bags into the zippered travel bag. He placed the strainer and several spoons into a brown grocery bag. He then gave Daniel the small quantities of cocaine which Daniel placed in his refrigerator. Hackett and Amos then left. The next morning Amos called Denise and asked her to meet him at Taylor's meat market. Amos took the zippered travel bag from Denise and told her he would meet her later. Amos was under surveillance by an agent of the Drug Enforcement Administration when he took the bag into the market. Two hours later Amos left the market without the bag. There was no evidence that Taylor ever got possession of any of the cocaine brought from Florida or that Taylor ever distributed any of it.

On November 3, 1977, Amos gave some baggies containing cocaine to Denise with instructions she was to deliver a bottle containing cocaine to Tommy Tate (an indicted co-conspirator) and one of the baggies each to Harris and "Jerry" when they came for it. Harris picked up his share and drove to Oxon Hill where he was arrested by the police. The police found a small quantity of cocaine on his person. The same day, Daniel was arrested in his apartment and the police found cocaine in his refrigerator. There was expert testimony by one of the detectives that a kilogram of cocaine in the fall of 1977 would have cost between $35,000 and $42,000 and that cutting the kilogram could produce about 4.5 kilograms for street sale at a total price of $322,000.

We have detailed the facts contained in the record in this

case because the appellants have raised a defense with which the Maryland Courts have never previously dealt; *i.e.,* the distinction to be made between a single conspiracy and multiple conspiracies for purposes of determining whether a variance in proof exists when an indictment charges a single conspiracy and proof at trial discloses multiple conspiracies. Appellants contend that the State obtains an unfair advantage if it is permitted to transform several separate transactions into one conspiracy. Under those circumstances, the State is permitted to introduce the acts and statements made by co-conspirators in a transaction against individuals involved in an entirely separate transaction by relying upon the co-conspirators' exception to the hearsay rule.

While our Courts have not been required previously to consider this issue, it has been raised in a number of federal jurisdictions. The multiple conspiracy defense has been most often analyzed in terms of "chain" and "wheel" conspiracies. *See* Note, *Federal Treatment of Multiple Conspiracies,* 57 Colum. L. Rev. 387 (1957); Tarlow, *Defense of a Federal Conspiracy Prosecution,* 4 National Journal of Criminal Defense 225-39 (1978). A "wheel" conspiracy is shown when a number of people (the spokes) are engaged in similar relationships with the same individual (the hub). The "chain" conspiracy is characterized by different activities carried on with the same subject of a conspiracy in such a manner that each conspirator in a chain-like manner performs a separate function which serves in the accomplishment of the overall conspiracy. *United States v. Perez,* 489 F.2d 511 (5th Cir. 1973). If we accepted appellants' contention that this was in fact a "wheel" conspiracy, the prosecution, pursuant to federal case dictates, would be required to prove that the existence of the other spokes was known to a particular defendant, and that that defendant did something in furtherance of a single, illegal enterprise in order that he be found to have conspired with the other spokes of the wheel. *United States v. Levine,* 546 F.2d 658 (5th Cir. 1977); *United States v. Manarite,* 448 F.2d 583 (2nd Cir.), *cert. denied,* 404 U.S. 947, 92 S. Ct. 303 (1971).

The classic case is *Kotteakos v. United States,* 328 U.S. 750,

66 S. Ct. 1239 (1946), in which thirty-two defendants were charged with conspiring to obtain government loans by fraud. The proof at trial showed one central figure (the hub) who acted as broker for all the other loans and at least eight separate loan transactions. No other connection was shown among those procuring the loans (the spokes). The Court analogized this to a wheel without a rim to enclose the spokes and reversed the convictions because of the prejudicial variance in proof. A close examination of *Kotteakos,* however, discloses that it is factually inapposite to the case *sub judice.*

The evidence produced by the Government in *Kotteakos* proved eight or more different conspiracies by separate groups of defendants who had no connection with each other except that all utilized one broker to handle fraudulent applications for loans. The trial court instructed the jury that only one conspiracy was charged, and that the acts and declarations of one conspirator bound all. In addition, the Government conceded that the appellants were convicted of a single general conspiracy by evidence which the Government admitted proved not one conspiracy but eight or more different ones of the same sort executed through a common key figure. 328 U.S. at 752. Under these circumstances, the Supreme Court reversed on the grounds that the appellants suffered substantial prejudice from being convicted of a single general conspiracy.

In the case at bar, it is clear to us that the evidence showed that the conspiracy had only one objective — to acquire cocaine for the purpose of distribution. It is clear that appellant Taylor acted with Amos Tinker to accomplish this end by providing the money for the purchase, and that Bolden, the other appellant, acted as the agent of Tinker to accomplish the same end by serving as a messenger for Tinker and by attempting to discover the existence of possible telephone surveillance. As we have carefully detailed in the recitation of the facts in this case, each of the other persons was involved in furthering the same general conspiracy. There was no proof of multiple conspiracies, and therefore no variance.

The evidence produced by the State was more than

sufficient to permit the jury to find beyond a reasonable doubt that Amos Tinker, Bolden and Taylor had reached a meeting of the minds, a unity of design and purpose. As the Court of Appeals noted in *Greenwald v. State,* 221 Md. 245, 250, 157 A.2d 119 (1960): "If it be proved that the Defendants sought the same objective and that one performed one function and the other another in the attainment of that objective, the inference that they were engaged in a conspiracy will be justified." The Supreme Court in *United States v. Perez,* *supra,* at 62, said:

> [t]here is no requirement that every defendant must participate in every transaction in order to find a single conspiracy. . . . With respect to the objectives of the conspiracy, it can be said that the prohibited activity must be committed in furtherance of a common objective. . . . [N]ot only must the objectives of all charged under one conspiracy be common, but there must be one objective, or set of objectives, or an overall objective to be achieved by multiple actions.

In *Blumental v. United States,* 332 U.S. 539, 557, 68 S. Ct. 248 (1947), the Court said: "[T]he law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connection with it, without requiring evidence of knowledge of all its details or of the participation of others."

Appellant Taylor in his fourth issue contends that the trial court erred in refusing to grant his specific instruction to the jury that the distribution of cocaine from Taylor to Tinker on two occasions was not sufficient evidence, by itself, to prove a conspiracy between appellant and Tinker. We find no merit in this contention. The trial court properly covered the requested instruction in the general instructions it gave to the jury on the law of conspiracy. The instruction as given was clear, specific and concise, and more than adequately advised the jury as to the proof required to find the appellants guilty beyond a reasonable doubt. It correctly advised the jury that it was required to weigh all the evidence, that it must consider

the acts of all the co-conspirators, and that an association of two parties is not itself sufficient to prove conspiracy. *See Bartholomey v. State,* 260 Md. 504, 273 A.2d 164 (1971), *vac. in part,* 408 U.S. 938, 92 S. Ct. 2870 (1972).

In his related fifth issue, appellant Taylor argues that the trial court erred in refusing to instruct the jury as to the law of variance. We do not agree. It is settled law in Maryland that the trial court must instruct on every point of law essential for proof of the crime charged and supported by the evidence when a request is made to do so. Maryland Rule 757 b; *Couser v. State,* 36 Md. App. 485, 374 A.2d 399 (1977), *aff'd* 282 Md. 125, 383 A.2d 389 (1978). But the trial court may justifiably decline to give such requested instructions where there is no evidence to support it. *See United States v. Anderson,* 532 F.2d 1218 (9th Cir. 1976), *cert. denied,* 97 S. Ct. 111 (1976); *United States v. Kearney,* 560 F.2d 1358 (9th Cir. 1977), *cert. denied,* 98 S. Ct. 522 (1977). A reading of the trial court's instructions actually given convinces us that the jury was given complete advisory instructions on the essential elements of conspiracy; that the jury's attention was focused on whether the appellant ever became a member of the conspiracy; that the indictment alleged a single conspiracy; and that the jury could convict both, one or none of the accused. The jury was adequately instructed notwithstanding the omission of appellant's requested instruction. *United States v. Bernstein,* 533 F.2d 775 (2d Cir. 1976), *cert. denied,* 97 S. Ct. 523 (1976).

## II

At the pre-trial motion hearing on May 23, 1978, appellant Taylor admitted to the trial court that no grounds then existed upon which he could legally be granted a separate trial from his co-defendants. This amounted to a waiver of his right to object to the trial court's pre-trial ruling. Rule 736 a. As we have held that there was no proof of multiple conspiracies and the evidence was sufficient to support the finding that appellant conspired with Amos Tinker, Ellen Bolden and others to distribute cocaine, the evidence would be mutually

admissible as to Bolden and appellant. No prejudice accrued to appellant Taylor by reason of the trial court's refusal to order separate trials. *See Shingleton v. State,* 39 Md. App. 527, 545-46, 387 A.2d 1134 (1978). The denial of the motion for separate trial was correct. Rule 745.

### III

Appellant Taylor contends that the trial court erred in permitting the State to strike the names of three named conspirators over his objection at the end of all the evidence. He argues that amounted to an amendment of the indictment as to substance and not as to form, and that the court's action changed the crime charged against him from a conspiracy involving nine persons to one involving six persons. He further argues that the amendment permitted him to be convicted of a different conspiracy from the one charged in the indictment. The law is well settled that amendments of substance include the characterization of the crime as well as the essential facts which must be proved to make the act complained of a crime, all else being form. *Brown v. State,* 285 Md. 105, 400 A.2d 1133 (1979); *Corbin v. State,* 237 Md. 486, 206 A.2d 809 (1965).

We said in *Terrell v. State,* 34 Md. App. 418, 422-23, 367 A.2d 95 (1977), in discussing the law of conspiracy:

> It is, of course, true that the crime of conspiracy cannot be committed by one person alone. The gravamen of the crime is the unlawful agreement between two or more persons. This does not mean, however, that more than one conspirator must be convicted or prosecuted. [Citation omitted.] It is *only essential to show that at least two persons had a meeting of the minds* — a unity of design and purpose — to accomplish a criminal or unlawful act, or to do a lawful act by criminal or unlawful means. [Citation omitted.] [Emphasis added.]

It follows, then, that even with the deletion of the names of the three co-conspirators from the indictment, the charge

against the appellant still alleged the unlawful combination of two or more persons, and the character of the crime remained the same, that of conspiracy to distribute controlled dangerous substances. The amendment permitted by the trial court may be construed as substantive only where it eliminated that part of the indictment which alleged the particular conspiracy charged so that appellant would be unable to defend himself or to subsequently plead double jeopardy. *State v. Lassotovitch,* 162 Md. 147, 159 A. 362 (1932). We conclude the amendment permitted was as to a matter of form and not as to substance.

## VI

Appellant Taylor was indicted with eight co-defendants on December 21, 1977. The State filed a motion for continuance on December 21, 1977 on the ground that new evidence previously unavailable to the State had become available because of plea negotiations and the resultant cooperation of Amos Tinker, Daniel Tinker, Denise Hackett and Ramsey Harris, Jr. Appellant Taylor did not object to the continuance *per se* but did object to its length (six weeks), contending a delay of not more than one week should have been permitted. It may well be that appellant has waived his right to challenge the continuance granted by the trial court and the matter is not properly before us. Rule 1085. However, assuming, *arguendo,* the issue has been properly preserved, we find no merit in it.

We set out in *Bethea v. State,* 26 Md. App. 398, 338 A.2d 390 (1975) the criteria for determining extraordinary cause which would justify a continuance to secure a missing witness under Rule 746 b. The trial court is required to determine: 1) whether there was a reasonable expectation of securing the evidence of the witness within a reasonable time; 2) whether the proffered evidence was competent and material; 3) whether the case could be fairly tried without the proffered evidence; 4) whether reasonable diligence to secure the evidence prior to the assigned trial date had been exercised by the party seeking the postponement.

The motion for continuance in the present case stated that the State expected to acquire evidence previously unavailable to it which went to the identity of the person who sold cocaine to Amos Tinker on October 30, 1977. That evidence also indicated the identity and subsequent availability at trial of the person who transported cocaine to Amos Tinker from and at the direction of the appellant on September 28, 1977.

Appellant Taylor urged at the pre-trial hearing and in his brief before us that the State, in obtaining a continuance on November 30, 1978 to gather additional evidence, failed to exercise due diligence because of the length of time between indictment and the plea negotiations with co-conspirators. The record does not support that contention. Pre-trial motions were not completed until July 7, 1978, and final rulings on motions to suppress were not made until August 4, 1978. One of the indicted co-conspirators, Amos Tinker, failed to appear for a pre-trial hearing and was not available for plea negotiation until November 6, 1978. Agreement with Amos Tinker was not reached until November 9, and the deposition of Amos Tinker was scheduled for November 29, 1978 but could not be taken because of his serious medical condition. Because of his terminal illness, the State was unable to produce Tinker as a witness and required the additional time to follow the leads provided by Tinker. Under the circumstances, we find no abuse of the trial court's discretion in granting the State's request for a continuance.

## VII

On September 27, 1977, agents for the State obtained a court order which authorized the interception of telephone communications "occurring over telephone line 891-2926 installed at 652 Fairview Avenue, Takoma Park, Prince George's County, Maryland." On September 30, 1977, the agents of the State, in the process of executing the lawfully authorized interception of a telephone call on that line, overheard that the number of the telephone at which they were that instant had been changed to 891-2460. An amended order was sought and issued on October 3, 1977 authorizing

the interception of telephone communications occurring over telephone 891-2460. Appellant Taylor argues the trial court erred in refusing to suppress all intercepted telephonic communications between September 30, 1977, when the State learned of the changed number, and October 3, 1977, when the amended order was signed. Appellant concedes that under 18 U.S.C. Section 2518 (4) (b) (1970) and Maryland Code (1974, 1979 Cum. Supp.) Courts Article, Section 10-408 (d) (ii), the State would have been entitled to obtain an order in general terms of the "nature and location of communication facilities where authority to intercept is granted." The appellant asserts, however, that the State obtained an order of court far narrower than that which the statutes authorized and that the State was therefore restricted to the interception and recording of telephone wire communications occurring *only* over telephone number 891-2926. Appellant contends that as soon as the officers discovered there was a change in the telephone number from 891-2926 to 891-2460, they were required by the strictures set out in *State v. Siegel,* 266 Md. 256, 292 A.2d 86 (1972) and *Poore v. State,* 39 Md. App. 44, 384 A.2d 103 (1978), to immediately cease interception until an amended order was obtained, and therefore, that the conversations intercepted in the interim period should have been suppressed. We think this argument is specious.

It is clear that the description requirements of 18 U.S.C. 2518 (4) are for the purpose of protecting the subject of a warrant from a general search or surveillance. *See United States v. Bynum,* 386 F. Supp. 449, 461 (S.D.N.Y. 1974) ("[V]ariations between the description in the warrant and the search actually conducted and the materials actually seized do not necessarily render the search and seizure invalid and require suppression").

In the present case, the variance in the telephone numbers did not reflect an actual variance in surveillance as the phone being intercepted remained the same and no interception occurred over any other telephone line other than that designated in the original order as being located at 652 Fairview Avenue. In addition, the State obtained an amended order within a reasonable time from its discovery of the

change in number. Under the circumstances, we find no error in the trial court's ruling on this motion.

## VIII

Finally, appellant Taylor asseverates that the trial court erred in its denial of his motion to suppress all the wiretap evidence in the case. The interception of communications ended on November 4, 1977. A sealing order was obtained on November 7, 1977. 18 U.S.C. 2518 (8) (a) (1970) and Section 10-408 (g) (1) of the Courts Article of the Annotated Code of Maryland (1974, 1979 Cum. Supp.) require that recordings made pursuant to a court order must be sealed under the court's direction immediately after the expiration of the period of a wiretap order. In the absence of an immediate sealing order, a satisfactory explanation for the delay is required. *See State v. Cerbo,* 78 N.J. 595, 397 A.2d 671 (1979). Appellant contends that the passage of the time from November 4 to November 7 permitted the State to possibly tamper with the recordings, and that the failure to obtain a prompt sealing order defeated the purpose of protecting the recordings from alteration. It must be stated, however, that there was no evidence offered to suggest that any tampering or alteration was attempted. Appellant urges that the failure to obtain an immediate sealing order from the judge who authorized the wiretap required the total suppression of all the wiretap evidence in the case. *See United States v. Gigante,* 538 F.2d 502 (2d Cir. 1976); *United States v. Ricco,* 421 F. Supp. 401 (S.D.N.Y. 1976); *Poore v. State, supra.*

We do not agree with appellant's position. There was testimony that November 4 was a Friday, and that the telephone interception ended at 11:00 a.m. The officer in charge of the recordings was off duty over the weekend, but prepared the tapes for sealing immediately upon reporting for work on Monday. The recordings were presented for sealing immediately thereafter. We think there was a satisfactory explanation for the minimal delay, and that compliance with the statutes was shown. *See United States v. Caruso,* 415 F. Supp. 847 (S.D.N.Y. 1976); and *Poore v. State, supra,* where

delays of twenty-four days and forty-two days were held to be satisfactorily explained. *See also United States v. Diana,* 605 F.2d 1307 (4th Cir. 1979) (case law on the sealing requirement discussed and a delay of thirty-nine days did not require suppression of telephone recordings).

Appellant Bolden also appealed from the judgments rendered against her in the Circuit Court for Prince George's County and raised five questions to be decided by her appeal, some of which are answered in Taylor's appeal and some others of which raise issues not included in those posited by Taylor. The five issues are stated as follows:

1. Did the trial judge err in admitting evidence of appellant's alleged conspiratorial activities prior to September 27, 1977?

2. Did the trial judge err in admitting the acts and declarations of third parties under the co-conspirators' exception to the hearsay rule?

3. Did the trial judge err in denying appellant's motion for severance?

4. Did the trial judge err in admitting testimony concerning the existence and operation of the Naddis computer?

5. Did the trial judge err in denying appellant's motion to suppress?

1.

Bolden, by the indictment returned against her, was charged with participation in a conspiracy that was alleged to have begun in April of 1977 and to have continued until November of 1977. She argues, however, that the trial court erred in admitting evidence of her activities prior to September 27, 1977. She points specifically to the testimony of Ramsey Harris, Jr. who testified that on April 25, 1977, he saw Amos Tinker at Bolden's house "making up an eighth of cocaine for someone else to pick up." Harris also testified as to Bolden's awareness of Tinker's activities, that in June, he received cocaine from Bolden at Tinker's direction, and that in August, he paid Bolden for cocaine he had received from

Tinker. Bolden contends that this evidence involved a previous, separate conspiracy between Tinker and her, and was isolated from the subsequent conspiracy between Amos Tinker and appellant Taylor. We do not agree. Bolden's reliance on *Ross v. State,* 276 Md. 664, 350 A.2d 680 (1976) and *Cross v. State,* 282 Md. 468, 386 A.2d 757 (1978) is misplaced because Harris's testimony involved only the specific single crime charged in the indictment and did not involve another crime. The evidence produced by the State clearly presented an on-going conspiracy to distribute cocaine. It is clear that Bolden throughout the period from April to November conspired with Tinker and later with Tinker and Taylor to distribute cocaine and to acquire additional cocaine to distribute. As was said in *Greenwald v. State,* 221 Md. 235, 250-51, 155 A.2d 894 (1960): "[I]f the conspiracy contemplated the continuous cooperation of the conspirators in the perpetration of a series of offenses against the sovereign within its scope and purpose, it was in effect 'a partnership in criminal purposes,' and continued until the time of its abandonment or the final accomplishment of its purposes." The activities of Bolden from April until November, then, were part of an on-going conspiracy to distribute cocaine.

Nor was there any evidence by Bolden that she took the necessary affirmative action to disavow or defeat the purposes of the conspiracy nor were there any positive steps made by Bolden to disassociate herself from the conspiracy in the April to November period. *See Hyde v. United States,* 225 U.S. 347, 32 S. Ct. 793 (1912); *United States v. Chester,* 407 F.2d 53 (3d Cir.), *cert. denied,* 394 U.S. 1020 (1969).

2.

Appellant Bolden, at pre-trial suppression hearings, moved to suppress the taped conversations offered by the State on the grounds that the State failed to comply with a number of the specific dictates of 18 U.S.C. Section 2518 (8) (a) (1970) and Code (1974, 1979 Cum. Supp.) Courts Article, Section 10-408

(g) (1). Her motions to suppress were denied. Bolden now argues that the State produced an insufficient foundation to justify the admission into evidence of the taped conversations. No such objection was raised either at the pre-trial suppression hearings or at trial. The issue has not been preserved on appeal. Rule 1085; *von Lusch v. State,* 31 Md. App. 271, 356 A.2d 277 (1972).

### 3.

We have stated our reasons for our finding that the trial court did not err in refusing to grant Taylor's motion for severance. The same reasons are applicable as to Bolden.

### 4.

Detective Nelson was permitted to testify as to the existence and operation of the Naddis computer maintained by the Drug Enforcement Administration. This system was stated to be international in scope and used to store information on past and current narcotic distributors. Nelson also stated that District of Columbia police officials had access to the Naddis system. The trial court instructed the jury that Nelson's testimony as to the computer was admitted to show the storage of information but not to create "any inference that either of the defendants on trial (Taylor or Bolden) are in that computer in any shape or form." Appellant Bolden argues that that testimony was irrelevant. We do not agree. We think Nelson's testimony supplied the nexus between Bolden's access to the computer and the request made by Amos Tinker that she check whether telephone surveillance was directed against him.

### 5.

Appellant Bolden also raised the issue of delay in obtaining a sealing order as to the taped telephone conversations and

our failure to find error in the court's refusal to suppress the conversation in Taylor's appeal is equally applicable here.

*Judgments affirmed as to each appellant, costs to be paid two-thirds by Taylor, one-third by Bolden.*